United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Altagracia Banuchi, as personal representative of the Estate of Edward Blanton Foster III, and on behalf of the Estate of Edward Blanton Foster III and the survivors of the Estate, E.F., J.F., A.D.F., N.F., M.F., and A.B.F., Plaintiff,<br><br>v.<br><br>City of Homestead and Anthony Green, Defendants. | Civil Action No. 20-25133-Civ-Scola |

### Order Granting in Part and Denying in Part Motion to Dismiss

Plaintiff Altagracia Banuchi, as personal representative of the Estate of Edward Blanton Foster III, and on behalf of the Estate of Edward Blanton Foster III and the survivors of the Estate, E.F., J.F., A.D.F., N.F., M.F., and A.B.F. (together "Banuchi"), has sued Defendants the City of Homestead (the "City") and police officer Anthony Green for damages, as a result of Green's on-duty shooting and killing of Foster. (Am. Compl., ECF No. 1-3 ("Compl.").) Banuchi has set forth ten counts: for violations of the Fourth and Fourteenth Amendments, under 42 U.S.C. § 1983 (counts one, four, and five); assault and battery (counts two and six); false imprisonment (counts three and seven); negligent use of a firearm (count eight); negligent training and/or supervision (count nine); and wrongful death (count ten). The Defendants have jointly filed a motion to dismiss, raising multiple issues, including Green's entitlement to qualified immunity; Banuchi's failure to state a claim under *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 662 (1978); the statute of limitations as to several claims; preclusion based on Florida's Wrongful Death Act; and shotgun-pleading concerns. Banuchi responded in opposition (Pl.'s Resp., ECF No. 18)[1] and the Defendants thereafter replied (Defs.' Reply, ECF

---

[1] Banuchi filed a "corrected" response to the Defendants' motion to dismiss shortly after the Defendants filed their reply. Banuchi's correction involved deleting an argument addressing a public-records request. Apparently, that issue was resolved, without Court intervention, rendering that argument moot. The Defendants did not object to the untimely filing or raise any issues regarding the propriety of the filing. In the interests of expediency, then, the Court deems Banuchi's corrected response (ECF No. 18) to be the operative response under consideration.

No. 17). After careful review, the Court grants the Defendants' motion, **in part**, and **denies it, in part** (**ECF No. 7**).

### 1. Background[2]

On July 16, 2015, at about 4:00 pm, Green, on duty, as a Homestead Police Department employee, and wearing his uniform, responded to a dispatch concerning an anonymous tip that a "light skinned" male was walking while armed with a gun. (Compl. ¶¶ 12, 33.) According to the dispatch, the subject was wearing red basketball shorts and a black or white shirt and was near Southwest 187th Avenue and 328th Street in Homestead. (*Id.*) At that time, Foster, a black man, was walking home from a store. (*Id.* ¶ 13.) Banuchi says that, as Green approached Foster, Green observed no criminal or suspicious behavior. (*Id.*) Upon making eye contact with Foster, Green drew his police-issued gun and pointed it at Foster. (*Id.* ¶ 14.) Foster headed behind an abandoned building, with Green pursuing him. (*Id.* ¶ 15.) Once behind the building, Green shot Foster eight times in the back, resulting in his death. (*Id.* ¶¶ 15, 32.)

Banuchi says Green "at no point feared for his life" and that "Foster posed no threat of immediate harm to Green's life or anyone else's life or property." (*Id.* ¶ 16.) Other officers involved, however, said they saw a gun on the ground, lying west of Foster's feet—and, indeed, a gun was recovered from the scene. (*Id.* ¶ 17.) Although a mixture of DNA was obtained from the grip and trigger of the gun, no conclusions were made regarding potential contributors when that mixture was compared to Foster's DNA. (*Id.*) Nor were any viable fingerprints developed from the gun's extended magazine or cartridges. (*Id.* ¶ 18.) After a five-year investigation, the state attorney's office issued a closeout memo about the incident. (*Id.* ¶ 19.) That report did not make an affirmative finding that "Green's testimony"[3] was consistent with the physical evidence. (*Id.*)

Since 2005, Green has been responsible for six police shootings, including Foster. (*Id.* ¶ 20.) Foster is Green's third shooting that has resulted in death. (*Id.* ¶¶ 20, 56.) In 2005, Green shot and killed an unarmed man during a struggle outside a convenience store. (*Id.* ¶ 21.) In 2007, Green shot and killed another man, as he witnessed an altercation between the man and his girlfriend. (*Id.* ¶ 22.) With respect to that shooting, Green said he believed the

---

[2] The Court generally accepts the Plaintiff's factual allegations as true for the purposes of evaluating the Defendants' motion to dismiss. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

[3] The Complaint doesn't specify what this testimony is or in what context Green provided it.

girlfriend and her son's lives were in danger. (*Id.*) A year after that, in 2008, Green shot a third man, a burglary suspect, twice in the stomach. (*Id.* ¶ 23.) That shooting was not fatal. (*Id.*) In 2011 and then again in 2013, Green was investigated regarding two other shootings. (*Id.* ¶¶ 24–25.) Green was never disciplined for any of these shootings, or the shooting of Foster. (*Id.* ¶ 26.) In fact, after the Foster shooting, Green received a raise and an apparent promotion from the Homestead Police Department. (*Id.* ¶ 27.)

Banuchi says that "complaints have been lodged against . . . Green for excessive force, neglect of duty, unbecoming conduct, unreasonable search and seizure, illegal arrest, illegal seizures, and other misconduct." (*Id.* ¶ 56.) She also complains that, variously, the City, the City's internal affairs divisions, and Green's supervisors and superiors, both before and after the Foster shooting, "failed to conduct proper administrative investigations into the complaints against . . . Green" (*Id.* ¶ 64a); "failed to lawfully and/or properly adjudicate the administrative investigations into the complaints against Green" (*Id.* ¶ 64b); "failed to properly investigate and/or discipline . . . Green" (*Id.* ¶ 64c); "failed to [remove] Green from [the ] Police Department for his history of unlawful searches and seizures and use of excessive force predating July 13, 2015" (*Id.* ¶ 64d); and "wrongfully allowed . . . Green's gun to be returned to him in 2013, pending resolution of a civil case and without a judicial order" (*Id.* ¶ 64f). Banuchi also asserts the City failed to implement a proper "early warning system" to address problems with officers who had the "highest number of personnel complaints," which system she says would have prevented the Foster shooting. (*See id.* ¶¶ 72–83.)

### 2. Legal Standard

A court considering a motion to dismiss, filed under Rule 12(b)(6), must accept all the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Although a pleading need only contain a short and plain statement of the claim showing that the pleader is entitled to relief, a plaintiff must nevertheless articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)) (internal punctuation omitted). A court must dismiss a plaintiff's claims if it fails to nudge its "claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 10(b) further requires a party to "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). "A shotgun pleading is a complaint that violates either Federal Rule of Civil Procedure 8(a)(2) or Rule 10(b), or both." *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021).

### 3. Analysis

#### A. Banuchi has met her initial burden of persuasion that Green is not entitled to the defense of qualified immunity on her Fourth Amendment claim against him.

Green maintains he is entitled to qualified immunity on count one. In support, he says he was acting within his discretionary authority and he did not violate clearly established law as to the Fourth Amendment. (Defs.' Mot. at 11–13.) In arguing that he did not violate clearly established law, Green relies, in large part, on a closeout memo issued by the state attorney's office, after its investigation of Foster's shooting. (*Id.* at 13; Defs.' Reply at 7.) The Court finds Green's reliance on that memo misplaced and is not otherwise persuaded by his argument.

Green submits that the Court should consider the contents of the memo because Banuchi (1) has affirmatively alleged the existence of both the investigation and the memo and (2) "***affirmatively represents and relies on the Memo's findings***." (Defs.' Reply at 7 (emphasis as supplied by Defendants).) More, however, is required: a court may consider a document outside the pleadings in a motion to dismiss only if the document is undisputed as well as "central to the plaintiff's claim." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). These requirements present two problems for Green.

First, the Court does not find the memo central to Banuchi's claim. While it is true she refers to the memo in one paragraph of her complaint (Compl. ¶ 19), this reference alone does not render the memo a necessary part of Banuchi's Fourth Amendment claim against Green. In mentioning the memo, Banuchi says, "After a five-year investigation, the State Attorney's Office issued its memo that did not determine (and could not determine) that Green's testimony was consistent with the physical evidence." (*Id.*) Green offers no explanation for how this reference to the memo renders it central to Banuchi's claim. This deficiency is particularly problematic in light of Banuchi's own limited mention of the memo as well as the substantive shortcomings of the allegation itself. For example, Banuchi doesn't explain, in her complaint, what

"testimony" of Green's she is referring to, nor does her pleading, elsewhere, ever identify any testimony at all from Green. Further, Banuchi's allegation refers to what is *not* in the memo, rather than what is in the memo, further undercutting any central role the memo might play in Banuchi's claim.

Second, and perhaps more importantly, even if the Court were to take judicial notice of the memo, that notice would not then translate into the Court's acceptance of the truth of the statements in the memo, as Green urges. That is, while the existence and authenticity of the memo itself may be undisputed, that would not then allow the Court to rely on the truth of memo's contents to determine, as Green urges, that he "feared for his life," thus justifying "the use of force . . . to prevent injury to himself." (Defs.' Reply at 7.)

Without the memo, Green's position on qualified immunity would require the Court to impermissibly construe the complaint's allegations in a light most favorable to the Defendants, as opposed to the Plaintiff. For example, Banuchi alleges Green approached Foster as Green was responding to a dispatch that a "light skinned male was walking while armed with a gun, wearing red basketball shorts and a black or white shirt near Southwest 187 Avenue and 328 Street in Homestead." (Compl. ¶¶ 12–13.) Banuchi then describes Foster as "a black man." (*Id.* ¶ 13.) Reading the allegations in the complaint in the light most favorable to the Plaintiff, the Court cannot say Foster fit the description of the male described in the dispatch. Next, Banuchi alleges that, as soon as Green made eye contact with Foster, Green drew his gun and pointed it at Foster. (*Id.* ¶ 14.) The complaint continues, saying only that Green then pursued Foster behind an abandoned building and then shot him eight times in the back. (*Id.* ¶ 15.) Thereafter, Banuchi acknowledges that a gun, which was not found to be necessarily forensically linked to Foster, was recovered from the scene, "lying west of Foster's feet." (*Id.* ¶¶ 17–18.) While Banuchi doesn't affirmatively deny Foster's possession of the gun, concluding that Foster had indeed possessed the gun, while certainly quite plausible, would require the Court to again improperly construe the complaint in Green's, rather than Banuchi's, favor. Accordingly, and in relying *solely* on the four corners of the complaint itself, as the Court must, the Court cannot find, as Green urges it to, that Green "feared for his life and the use of deadly force was, therefore, justified to prevent injury to himself pursuant to [Florida statutes]." (Defs.' Reply at 7.) For that reason, then, the Court denies Green's motion to dismiss on the basis of qualified immunity with respect to Banuchi's § 1983 claim under the Fourth Amendment.

### B. Green is entitled to qualified immunity with respect to Banuchi's Fourteenth Amendment claim.

Banuchi's Fourteenth Amendment claim, however, included within count one, along with her Fourth Amendment claim, does not fare as well. Instead, the Court agrees with Green that Banuchi has failed to allege the violation of a clearly established constitutional right under the Fourteenth Amendment. *See Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019), *cert. denied,* 141 S. Ct. 110 (2020) ("Generally speaking, it is proper to grant a motion to dismiss on qualified immunity grounds when the complaint fails to allege the violation of a clearly established constitutional right.") (cleaned up).

"*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach" under the Fourteenth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis added). Because Banuchi unequivocally alleges Green shot Foster, resulting in Foster's death, the Fourteenth Amendment is inapplicable. *See Carr v. Tatangelo*, 338 F.3d 1259, 1267 (11th Cir. 2003), *as amended* (Sept. 29, 2003) (recognizing the distinction and noting that a Fourth Amendment analysis applies to a plaintiff who was shot whereas a Fourteenth Amendment analysis applies to a plaintiff who "was not impacted physically in the shooting"). Banuchi does not otherwise allege any facts that would support a substantive due-process claim.

Banuchi's arguments in opposition miss the mark. She asserts that, because Green does "not clearly and unequivocally concede that Foster was seized" (Pl.'s Resp. at 5), she can plead a violation of the Fourteenth Amendment, in the alternative, as allowed by Rule 8(d)(2). And, then, without any supporting case law or references to her complaint, she concludes that "Green's actionable conduct amounted to a substantive due process violation." (Pl.'s Resp. at 6.) While Banuchi is certainly correct that she is *permitted* to plead a claim in the alternative, she has not actually done so here. That is, she has failed to set forth allegations that would show that Green violated a clearly established constitutional right under the Fourteenth Amendment. Further, whether Green concedes that Foster was "seized" or not, is irrelevant. Instead, the Court's analysis is confined to the allegations set forth in the complaint. And, by Banuchi's own allegations, Foster was seized, thus implicating the Fourth, and not the Fourteenth, Amendment.

### C. Banuchi fails to state a *Monell* claim under § 1983 against the City.

"The Supreme Court has placed strict limitations on municipal liability under § 1983," recognizing that such liability "may not be based on the doctrine of respondeat superior." *Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). Instead, to ward off dismissal of a § 1983 claim against a municipality, a plaintiff must allege facts showing: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). As for the second element, which the Court focuses on here, there are two avenues available to a plaintiff attempting to assert a municipal policy: "identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech*, 335 F.3d at 1329. As Banuchi has not alleged "an officially-adopted policy of permitting a particular constitutional violation," she must establish that the City "has a custom or practice of permitting it and that the [City]'s custom or practice is the moving force behind the constitutional violation." *Id.* at 1330 (cleaned up). "In order for a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice" with actual or constructive knowledge of that practice by the municipality's governing board. *McDowell*, 392 F.3d at 1290. Random acts, isolated incidents, or dissimilar complaints are insufficient to establish a custom or policy. *Id.* In order to survive dismissal on each §1983 count against the City, then, Banuchi must allege other incidents, occurring on a widespread basis, involving factual situations that are substantially similar to the facts alleged in this case. As set forth below, the Court does not find she has done so.

### (1) Count Four

In count four, Banuchi alleges the City had a number of unofficial customs or practices, falling, more or less, into three general categories: (1) insufficient investigations or processing of complaints of officer misconduct (Compl. ¶¶ 58, 59); (2) inadequate recordkeeping (*id.* ¶¶ 60, 61); and (3) maintenance of a "code of silence" among City officers (*id.* ¶¶ 58, 62–64). According to Banuchi, these practices resulted in Foster's shooting death. (*Id.* ¶¶ 67, 68, 70.) In its motion to dismiss, the City argues that, despite summarily identifying a long list of what Banuchi describes as "de facto policies, practices and/or customs," Banuchi has failed to set forth any actual factual allegations establishing that the City has a widespread pattern and

practice of inadequately handling police misconduct complaints, insufficient recordkeeping, or an improper "code of silence." The Court agrees.

Banuchi says that the factual basis of her claim rests on her allegations of the City's "continued use of an officer with a well-known history of on-duty shootings and on-duty killings of civilians." (Resp. at 6.) Banuchi maintains her complaint "alleges five prior on-duty shootings plus a catalogue of other misconduct and police violence by Green prior to the Foster shooting." (*Id.* at 7.) She also says that count four "details the customs and practices that allowed Green to remain armed despite numerous on-duty shootings and numerous investigations into alleged excessive force, neglect of duty, unbecoming conduct, unreasonable searches and seizures, illegal arrests, illegal seizures, and other misconduct." (*Id.* 7–8 (citing Compl. ¶ 56).) But Banuchi's allegations, along with her characterization of those allegations, are problematic.

First, the vast majority of Banuchi's allegations are comprised of vague and conclusory assertions, devoid of factual support. For example, Banuchi lists dozens of "de facto policies, practice, and/or customs" (Compl. ¶¶ 57–64) but provides no factual support that would establish the necessary widespread and persistent practice required for municipal liability. Similarly, Banuchi's vague claims that "complaints have been lodged against . . . Green for excessive force, neglect of duty, unbecoming conduct, unreasonable search and seizure, illegal arrest, illegal seizure, and other misconduct" (*id.* ¶ 56) are both factually unsupported and, in any event, insufficient. Banuchi provides no context for the "complaints": Who submitted them? When were they submitted? To whom were they submitted? How many were there? What did they say? Further, even if Banuchi had set forth facts supporting the existence of the alleged complaints, she fails to allege whether the complaints were ever substantiated in any way. Lastly, her reference to Green's having "used deadly force against three others and excessive force not resulting in death against a fourth" (*id.*) is also conclusory and vague: missing is any allegation that the deadly force was improper or any facts showing that the force, against the fourth person, was actually excessive. Banuchi's summarily labelling it as excessive, is simply not enough.

Banuchi's separate allegations, as to Green's prior shooting incidents, elsewhere in her complaint fare no better. While she provides more details about the shootings, she fails to even allege that any of them amounted to excessive force. (*See* Compl. ¶¶ 21 ("In 2005, Green shot and killed an unarmed man . . . during a struggle."); 22 ("In 2007, Green shot and killed [a man]" after witnessing an altercation between him and his girlfriend and thinking "the lives of the girlfriend and her son were in danger."); 23 ("[I]n

2008, Green again shot . . . a burglary suspect [who] lived."); 24 ("In 2011, Green was investigated for a fourth shooting."); 25 ("In 2013, Green was investigated for a fifth shooting.").) In sum, Banuchi fails to allege facts supporting the kind of widespread, known, and substantially similar constitutional violations that are required to state a *Monell* against the City.

Second, Banuchi's characterization of her complaint's allegations, in her response, is misleading. She argues that her complaint "alleges . . . a catalogue of . . . misconduct and police violence by Green prior to the Foster shooting." (Resp. at 7.) Tellingly, she provides no citation to her complaint to support her claim. And, indeed, there is no factual support for Banuchi's portrayal of Green's prior "misconduct" or unconstitutional "police violence" anywhere in the complaint.

Accordingly, then, Banuchi has failed to allege facts showing a pattern of prior known, constitutional violations that rise to the level of establishing any kind of unofficial policy that could have led to Green's shooting of Foster. Accordingly, the Court dismisses count four.

### (2) Count Five

In count five, Banuchi identifies a number of City "failures": a failure to maintain or utilize an "early warning system" to detect personnel problems (Compl. ¶¶ 73–74); a failure to identify officers with the highest numbers of complaints (*id.* ¶¶ 75–77); and a failure to "act on" the identification of officers with the highest number of personnel complaints (*id.* ¶ 77–78). Once again, like her allegations in count four, Banuchi's claims of "de facto policies, practices, and/or customs" are wholly unsupported by any accompanying facts. The cases Banuchi relies on as support prove the point: in contrast to her own allegations, the complaints in those cases allege actual facts establishing a history of excessive force. *E.g.*, *Hogan v. City of Easton*, CIV A 04-759, 2006 WL 3702637, at *10 (E.D. Pa. Dec. 12, 2006) (finding a policy established where the plaintiffs "identified at least 12 incidents of excessive force involving [one officer], 22 incidents of excessive force involving [another], . . . and 2 involving [yet another]").

And so, for the same reasons set forth above, in the preceding section, the Court dismisses count five because Banuchi fails to allege facts showing a pattern of prior known, constitutional violations that rise to the level of establishing an unofficial policy that led to Green's shooting of Foster.

### D. Banuchi's assault and false-imprisonment claims are time barred.

Banuchi first sought relief against the Defendants in July 2017, in state court. (Defs.' Mot. at 3.) Thereafter, in 2018, the Defendants removed the case to this Court. *See Banuchi v. City of Homestead*, 18-CV-23711-RNS, ECF Nos. 1 (S.D. Fla Sep. 11, 2018) ("*Banuchi I*"). At that time, however, the State Attorney's Office was still investigating Foster's death. (Defs.' Mot. at 3.) As a result, the parties agreed Banuchi would dismiss the federal litigation, pending completion of the investigation. (*Id.* at 3–4.) The parties do not dispute that the Defendants agreed to waive the statute of limitations as a defense if Banuchi refiled the same causes of actions, as raised in her initial complaint, within thirty days of the State Attorney's issuing a closeout memorandum. (*Id.* at 7; *Banuchi I*, ECF No. 39, 2l; Pl.'s Reply at 15–16.) In Banuchi's refiled complaint, in this case, however, she added four new claims: state-law claims for assault (part of counts two and six) and for false imprisonment (counts three and seven) against both Defendants. Banuchi did not previously raise these state-law claims and, therefore, the Defendants argue they may raise the statute of limitations as a defense to those counts. And, according to the Defendants, these claims are all time barred. The Court agrees.

For her part, Banuchi does not disagree with the Defendants' characterization of the parties' agreement. Nor does she deny that these claims were not part of her initial complaint. Instead, she argues the new claims "relate back" as provided for by Rule 15(c)(1)(B). Rule 15 (c)(1)(B) allows an amendment to relate back to the date of an original pleading when the amendment asserts a claim "that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). As Banuchi explains it, this "'relation back' causes an otherwise untimely claim to be considered timely by treating it as if it had been filed when the timely claims were filed." (Pl.'s Resp. at 16 (quoting *Davenport v. United States*, 217 F.3d 1341, 1344 (11th Cir. 2000)).) While this is a correct statement of the law, the Court finds the concept is inapplicable here.

Instead, standing in the way of Banuchi's relation-back argument is her earlier dismissal of the 2017 complaint. Indeed, that is the very reason she needed the Defendants to agree to waive their right to raise the statute of limitations as a defense: without that waiver, the claims set forth in Banuchi's complaint would have all been time barred by the time the State Attorney issued the closeout memo. Simply put, "[d]ismissal of a complaint, without prejudice, does not allow a later complaint to be filed outside the statute of limitations." *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1242 (11th Cir. 2004). "Instead, voluntary dismissal of a complaint has the effect of placing the parties

in a position **as if the suit had never been filed**." *Alvarado v. Miami-Dade County*, 15-22193-CIV, 2016 WL 9503810, at *15 (S.D. Fla. Oct. 24, 2016) (Goodman, Mag. J.) (emphasis in original). Accordingly, Banuchi's voluntary dismissal precludes applying the relation-back rule.

There appears to be no dispute that the statute of limitations for the assault and false imprisonment claims began to run in July 2015, when Foster was shot and killed. *See* Fla. Stat. § 95.11(3)(o). There is also no dispute that the limitations period then expired four years later, in 2019. Banuchi voluntarily dismissed the initial action on April 9, 2020, at which point, then, the new claims were already time barred. Although the statute of limitations is an affirmative defense, it may be raised in a motion to dismiss "when failure to comply with the statute of limitations is plain on the face of the complaint." *Foster v. Savannah Commc'n*, 140 Fed. App'x 905, 907 (11th Cir. 2005). Banuchi does not deny, and the Court finds, that Banuchi's failure to comply with the statute of limitations is plain on the face of her complaint. Accordingly, the Court concludes that the assault claims in counts two and six and the entirety of counts three and seven all time barred.[4]

### E. All the personal-injury torts set forth in counts two, three, six, seven, eight, and nine are precluded by Florida's Wrongful Death Act.

The Defendants next argue that Banuchi's personal-injury tort claims (including assault, battery, false imprisonment, and negligence), as set forth in counts two, three, six, seven, eight, and nine, must be dismissed as they are all precluded by Florida's Wrongful Death Act. (Defs.' Mot. at 8–9.) Banuchi largely ignores or misconstrues the Defendants' position, submitting, as best the Court can discern, that the Defendants' approach would unnecessarily complicate her case as well as interfere with her right to be the manager of her own complaint. (Pl.'s Resp. at 16–17.) Banuchi's assessment misses the mark.

Under Florida's Wrongful Death Act, "[w]hen a personal injury to the decedent results in death, no action for the personal injury shall survive, and any such action pending at the time of death shall abate." Fla. Stat. § 768.20. The Florida Supreme Court has unequivocally addressed the issue: "no separate statutory action for personal injuries resulting in death can survive the decedent's demise." *Martin v. United Sec. Services, Inc.*, 314 So. 2d 765, 770 (Fla. 1975). Thus, "any personal injury claims alleging wrongdoing that ultimately resulted in the death of the decedent are extinguished upon death, leaving the statutory wrongful death claim as the only avenue for damages

---

[4] Even if these claims were not time barred, they are also subject to dismissal, as set forth below, based on Florida's Wrongful Death Act.

against the tortfeasor." *Mucciolo v. Boca Raton Reg'l Hosp., Inc.*, 824 Fed. App'x 639, 643–44 (11th Cir. 2020). "[A]lternative theories of relief [are] subsumed in the wrongful death claim, and no claim, other than the statutory wrongful death claim, [can] be brought or require[s] consideration by the district court." *Id.* at 644.

Here, Banuchi alleges Foster's death was caused "by being shot in the back eight times by Officer Green." (Compl. at 1; *see also* Compl. ¶¶ 15, 20.) In each of counts two, three, six, seven, eight, and nine, Banuchi alleges conduct that, according to the complaint, ultimately resulted in Foster's death. (Compl. at 1; Compl. ¶¶ 15, 20, 44, 51, 92, 95, 107, 113.) This renders Florida's Wrongful Death Act applicable to all six of these counts. *See Hinson v. Warren*, 17-14018-CIV, 2017 WL 1319657, at *2 (S.D. Fla. Apr. 10, 2017) (Marra, J.) (finding Florida's Wrongful Death Act applicable where claims of alleged negligent retention and hiring by a sheriff, as presented in a complaint, ultimately contributed to the death of decedent).

Banuchi's argument in opposition is meritless. First, her characterization of two of the cases cited by the Defendants is wholly misleading. She maintains that in those two cases, the courts ordered the plaintiffs to amend their complaints in order to merge their negligence and intentional-tort claims into one wrongful-death count. (Pl.'s Resp. at 17.) This is altogether incorrect. Instead, in both cases, the courts unambiguously dismissed the personal-injury claims, with prejudice. *See Hinson*, 2017 WL 1319657, at *2 (dismissing claims for negligent hiring and negligent retention while allowing amendment only as to the plaintiff's § 1983 claims); *Cone v. Orosa*, 13-CV-24674-JLK, 2014 WL 1383028, at *3 (S.D. Fla. Apr. 8, 2014) (King, J.) ("[U]nder Florida law, the claims for battery and negligence cannot stand as independent causes of action and . . . must be dismissed with prejudice."). Nor is Banuchi's argument that she is the "master of the complaint" persuasive. (Pl.'s Resp. at 17.) Banuchi fails to explain how being in control of how she presents her claims translates into a way around the limits set forth in Florida's Wrongful Death Act.

In sum, then, all of Banuchi's personal injury claims, as presented in counts two, two, three, six, seven, eight, and nine, are precluded by Florida's Wrongful Death Act.

### F. Banuchi must amend her wrongful death claim.

Lastly, the Defendants submit count ten of Banuchi's complaint, seeking damages for Foster's wrongful death, should be dismissed because it is a form

of shotgun pleading. (Defs.' Mot. at 6–7.)[5] As the Defendants point out, count ten reincorporates paragraphs 1 through 105—nearly the entire complaint (except for ten paragraphs)—and eight of the of nine preceding counts. (Compl. ¶¶ 115, 117.) In response, Banuchi generally rejects the idea that count ten is a shotgun pleading, maintaining her pleading is not confusing and should not prevent the defendants from figuring out which allegations are applicable to which aspect of her claim. The Court agrees with the Defendants.

By incorporating eight other counts, resulting in count ten's being made up of over a hundred paragraphs, some of which have several subparts, the Court finds it virtually impossible to determine which facts are intended to support Banuchi's wrongful-death claim. This is especially so now, considering the Court has dismissed, as set forth above, a number of the counts upon which count ten is purportedly based. In other words, the relief sought in count ten is not set forth in a discrete and succinct manner such that the Defendants have fair notice of the claims against them. As such, it must be repleaded before the Defendants are required to respond to it.

### 4. Conclusion

As set forth above, the Court **grants in part and denies in part** the Defendants' motion to dismiss. (**ECF No. 7**.) The Court dismisses counts two through nine in their entireties, with prejudice. The Court also dismisses, with prejudice, count one, against Green, but only in part, as to Banuchi's claim under the Fourteenth Amendment—Banuchi's claim against Green under the Fourth Amendment survives dismissal. Finally, the Court strikes count ten, as a shotgun pleading.

If Banuchi would like to replead count ten, she must do so on or before **June 16, 2021**. In her amended pleading, she may not add any facts or claims that were not previously presented in her first amended complaint. In the amended complaint, the § 1983 claim against Green must be repleaded to exclude any relief requested based on the Fourteenth Amendment. If Banuchi timely files an amended complaint, the Defendants must file their response within **ten days**. If the Plaintiffs opt not to file an amended complaint, they must file a notice of that intention, on or before **June 10, 2021**. In that event, the Court will dismiss count ten, therefore terminating the City's participation in this case. Green must then, within **ten days** of the filing of the notice, file his answer to the remaining claim in this case: Banuchi's § 1983 claim under

---

[5] The Defendants also argue other counts implicate shotgun pleading problems as well. But, because (1) those counts were not so poorly drafted that the Court was unable to discern Banuchi's claims or the facts upon which each claim was based and (2) those counts are, in any event, being dismissed, the Court declines to address those issues.

the Fourth Amendment, as presented in count one of the first amended complaint (ECF No. 1-3).

To the extent Banuchi intended, through her response, to seek leave to amend the counts that have been dismissed with prejudice, that request is denied. This bid seems to have been inserted in the last few lines of Banuchi's opposition, as a mere afterthought. (Pl.'s Resp. at 17–18 ("[S]hould the Court dismiss any portion of the [complaint], the dismissal must be without prejudice with leave to file an amended complaint.").) Such a request, however, is procedurally defective as well as lacking in substantive support. *See Newton v. Duke Energy Florida, LLC,* 895 F.3d 1270, 1277 (11th Cir. 2018) ("[W]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly."); *Avena v. Imperial Salon & Spa, Inc.*, 740 Fed. App'x 679, 683 (11th Cir. 2018) ("[W]e've rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend.") (noting also that "a motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment") (cleaned up).

**Done and ordered**, in Miami, Florida, on June 8, 2021.

_____
Robert N. Scola, Jr.
United States District Judge