## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 20-25133-CIV-SCOLA/GOODMAN

ALTAGRACIA BANUCHI,

      Plaintiff,

v.

CITY OF HOMESTEAD and
ANTHONY GREEN,

      Defendants.

_____/

### OMNIBUS ORDER ON *DAUBERT* MOTIONS[1]

"When facts are few, experts are many."

-   Donald R. Gannon

This is a civil rights and wrongful death action filed by Plaintiff Altagracia Banuchi

---

[1] The Undersigned is issuing an Order (as opposed to a Report and Recommendations) on the parties' *Daubert* motions because rulings on the admissibility of evidence at trial (including expert testimony) are non-dispositive matters. *See Villafana v. Auto-Owners Ins.*, No. CIV.A.06 0684 WS B, 2007 WL 1810513, at *1 (S.D. Ala. June 22, 2007) (stating that "the weight of authority holds that a magistrate judge's order that excludes a plaintiff's expert from testifying is not a dispositive ruling"); *see also Bennie v. Compaq Computer Corp.*, No. 00-2235-CIV, 2002 WL 34714567, at *1 (S.D. Fla. Oct. 21, 2002) (issuing an order on a motion to exclude expert testimony because "[a] Magistrate Judge may enter an order, as opposed to a report and recommendation, regarding a motion *in limine* that is based on Federal Rule of Civil Procedure 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)"). In addition, the referral Order expressly mentions 28 U.S.C. § 636(b)(1)(A) and Local Magistrate Judge Rule 1(c), both of which concern non-dispositive pretrial matters.

("Banuchi"), as personal representative of the estate of Edward Blanton Foster III ("Foster"), and on behalf of the survivors of the estate, E.F., J.F., A.D.F., N.F., M.F., and A.B.F., against Defendants the City of Homestead ("City") and police officer Anthony Green ("Officer Green"). [ECF No. 26]. The following claims remain: a federal civil rights claim for violations of the Fourth Amendment against Officer Green (Count I) and a Florida wrongful death claim based on battery against Officer Green and the City of Homestead ("City") (Count X, subparts (B) and (C)). [ECF Nos. 26; 52].

Defendants filed a *Daubert* motion[2] seeking to exclude Plaintiff's rebuttal expert Michael A. Knox, Ph.D. ("Dr. Knox"), Plaintiff filed an opposition response, and Defendants filed a reply. [ECF Nos. 71; 80; 81]. Plaintiff filed a *Daubert* motion seeking to exclude Defendants' expert Dr. Richard M. Hough ("Dr. Hough"), Defendants filed an opposition response, and Plaintiff filed a reply. [ECF Nos. 73; 78; 83].

United States District Judge Robert N. Scola, Jr. referred to the Undersigned the *Daubert* motions "to be heard and determined, consistent with 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72, and Rule 1(c) of the Local Magistrate Judge Rules." [ECF No. 74].

---

[2]    *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

I.      **Background**

A.      **Factual Allegations**

Judge Scola succinctly summarized the factual allegations in the Second Amended

Complaint in his Order granting in part and denying in part Defendants' second motion

to dismiss:

> On July 16, 2015, at about 4:00 pm, Green, on duty, as a Homestead Police Department employee, and wearing his uniform, responded to a dispatch concerning an anonymous tip that a "light skinned" male was walking while armed with a gun. (2nd Am. Compl. ¶¶ 10, 12–13.) According to the dispatch, the subject was wearing red basketball shorts and a black or white shirt and was near Southwest 187th Avenue and 328th Street in Homestead, Florida. (*Id.* ¶ 12) At that time, Foster, a black man, was walking home from a store. (*Id.* ¶ 13.) As Green approached Foster, Green observed no criminal or suspicious behavior. (*Id.*) Upon making eye contact with Foster, Green immediately drew his police-issued gun and pointed it at Foster. (*Id.* ¶ 14.) Foster headed behind an abandoned building, with Green in pursuit. (*Id.* ¶ 15.) Once behind the building, Green shot Foster eight times in the back, resulting in his death. (*Id.* ¶¶ 15, 31.)
>
> Banuchi says Green "at no point feared for his life" and that "Foster posed no threat of immediate harm to Green's life or anyone else's life or property." (*Id.* ¶ 16.) Other officers involved, however, said they saw a gun on the ground, lying west of Foster's feet—and, indeed, a gun was recovered from the scene. (*Id.* ¶ 17.) Although a mixture of DNA was obtained from the grip and trigger of the gun, no conclusions were made regarding potential contributors when that mixture was compared to Foster's DNA. (*Id.*) Nor were any viable fingerprints developed from the gun's extended magazine or cartridges. (*Id.* ¶ 18.) After a five-year investigation, the state attorney's office issued a closeout memo about the incident. (*Id.* ¶ 19.) That report did not make an affirmative finding that "Green's testimony" was consistent with the physical evidence. (*Id.*)
>
> Since 2005, Green has been responsible for six police shootings, including Foster. (*Id.* ¶ 20.) Foster is Green's third shooting that has resulted in death. (*Id.* ¶¶ 20, 56.) In 2005, Green shot and killed an unarmed man during a

struggle outside a convenience store. (*Id.* ¶ 21.) In 2007, Green shot and killed another man, as he witnessed an altercation between the man and his girlfriend. (*Id.* ¶ 22.) With respect to that shooting, Green said he believed the girlfriend and her son's lives were in danger. (*Id.*) A year after that, in 2008, Green shot a third man, a burglary suspect, twice in the stomach. (*Id.* ¶ 23.) That shooting was not fatal. (*Id.*) In 2011 and then again in 2013, Green was investigated regarding two other shootings. (*Id.* ¶¶ 24–25.) Green was never disciplined for any of these shootings, or the shooting of Foster. (*Id.* ¶ 26.) In fact, after the Foster shooting, Green received a raise and an apparent promotion from the Homestead Police Department. (*Id.* ¶ 27.)

[ECF No. 52, pp. 2-3 (footnotes omitted)].

**B.      The Instant *Daubert* Motions**

Plaintiff seeks to exclude the opinions of Defendants' expert, Dr. Hough. [ECF No. 73]. Dr. Hough has rendered five opinions on three topics: (1) the recovery of latent fingerprints or DNA of value on firearms (Opinions 1, 2, and 5); (2) the so-called "CSI Effect" (Opinion 3); and (3) the location of Officer Green when he discharged his firearm (Opinion 5). [ECF No. 73-1]. Plaintiff argues that Dr. Hough's opinions must be excluded because Dr. Hough is not qualified to render any of these opinions, his opinions are not based on reliable methods, and are not helpful to the jury.

Defendants seek to exclude Plaintiff's rebuttal expert, Dr. Knox. [ECF No. 71]. Plaintiff retained Dr. Knox to rebut some of Dr. Hough's opinions. Dr. Knox has opined on two topics in this case: (1) based on the location of spent casings, it is possible that Officer Green was inside or outside his police vehicle when he discharged his firearm and (2) it is just as probable that a person's fingerprints or DNA is *not* recovered from a firearm because that person did not touch the firearm. [ECF No. 71-1]. According to

Defendants, Dr. Knox's opinions should be excluded in their entirety because they are not based on reliable principles or methods and will not assist the trier of fact.

For the reasons discussed below, the Undersigned **grants in part (and denies in part)** Plaintiff's *Daubert* motion [ECF No. 73] and **grants** Defendants' *Daubert* motion [ECF No. 71].

## II.     Applicable Legal Standard

The District Court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993). Federal Rule of Evidence 702 governs the admission of expert testimony, as explained and refined by the United States Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 582 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

Rule 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be "[s]cientific method; good grounds and appropriate validation." *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005).

Reliability of the methodology requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer

review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Rink*, 400 F.3d at 1292; *see also Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

These reliability factors, however, are non-exhaustive. *Kumho Tire*, 526 U.S. at 150; *Rink*, 400 F.3d at 1292. Thus, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7. The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's testimony. *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) (*en banc*). The party proffering the expert also has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341. Thus, a court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. Instead, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509

U.S. at 596).

A less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

Furthermore, courts "must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *Id.* at *7 (quoting *Quiet Tech DC–8, Inc.*, 326 F.3d at 1341).

On the other hand, courts do not hesitate to exclude purported expert testimony which does not pass muster. *See Allison*, 184 F.3d at 1322 (affirming summary judgment in favor of silicone breast implant manufacturers and upholding district court's exclusion of proffered expert's causation testimony under *Daubert*); *Rink*, 400 F.3d at 1286 (affirming exclusion of expert testimony in products liability and toxic trespass action against pesticide manufacturer and therefore affirming summary judgment for defendant); *Frazier*, 387 F.3d at 1263 (finding trial court in criminal case did not abuse its discretion in excluding proffered expert testimony from forensic investigator); *Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183, 1201–03(11th Cir. 2010) (affirming defense summary judgment for infant car seat manufacturer in products liability lawsuit involving child who sustained traumatic brain injuries and upholding trial court ruling which excluded expert testimony because the experts were not sufficiently reliable).

### III.    Analysis

Because any curtailment of Dr. Hough's opinions will likely affect the permissible scope of Dr. Knox's rebuttal opinions, the Undersigned will first address Plaintiff's motion seeking to exclude Dr. Hough as an expert in this case.

### A.    Plaintiff's *Daubert* Motion

Dr. Hough's report[3] contains the following five opinions:

1. **It is the norm not to be able to find or recover latent fingermarks of value on firearms**. The circumstance is far more common than uncommon.

2. **It is the norm not to be able to find or recover sufficient DNA of value on firearms**. The circumstance is far more common than uncommon.

3. **The modern citizen has watched many television shows and movies that incorporate entertainment portrayals of forensic techniques**. This baseline of **inaccurate and incomplete knowledge can result in unrealistic justice system expectations**.

4. **Based on the physical and testimonial evidence furnished to me, Officer Green was inside of his assigned patrol car when he fired at Mr. Foster**. Locations marked by crime scene personnel in photos AJR 96-100, 107, 108, and 133-148, provide views of documented items of evidence illustrating some of the physical aspects of the scene supporting this opinion.

5. **There is no empirical evidence that I have reviewed that states a likelihood of recovering either fingermarks or DNA from firearm**

---

[3]    Plaintiff seeks to exclude the opinions in Dr. Hough's *initial* report, dated February 11, 2022. [ECF No. 73-1]. Dr. Hough issued a supplemental report on March 3, 2022, after reviewing laboratory analysis reports. [ECF No. 78-1]. In his supplemental report, Dr. Hough states that his opinions have not changed. *Id.*

**evidence in similar or dissimilar circumstances**.[4]

[ECF No. 73-1, pp. 16-17 (emphasis added; footnote added)].[5]

As noted above, Plaintiff seeks to exclude all five opinions. The Undersigned will address these opinions in turn. However, because the fifth "opinion" is not actually a substantive opinion, the Undersigned will not be analyzing the *Daubert* factors for this fact-based non-opinion.

      1.      **Finding or Recovering Latent Fingerprints and DNA of Value on Firearms (Opinions 1, 2, and 5)**

Dr. Hough renders three opinions concerning the ability to find or recover latent fingerprints and DNA of value on firearms. [ECF No. 73-1, pp. 16-17]. He opines that: (1) "[i]t is the norm not to be able to find or recover latent fingermarks of value on firearms"; (2) "[i]t is the norm not to be able to find or recover sufficient DNA of value on firearms";

---

[4]      This fifth opinion is not actually an opinion. Plaintiff analogizes this last opinion to "a lawyer 'Westlawing' a legal issue and then telling the judge 'I did not find any law on that point.'" [ECF No. 73, p. 4]. However, there is nothing wrong with an expert telling the jury that based on his review, he has not found any studies, for example, stating the likelihood of obtaining certain evidence from a firearm. Dr. Hough is not opining that no such studies exist; he is merely stating that he has not encountered any in his review. Plaintiff is free to question Dr. Hough about the exhaustiveness of his search and is free to confront Dr. Hough with such studies, if any exist. *See Rink*, 400 F.3d at 1293 n.7 ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

[5]      Dr. Hough's report contains two sets of page numbers. The page numbers appearing at the bottom, right-hand corner of each page and the page numbers automatically assigned by the Court's CM/ECF system, appearing at the top, right-hand corner of each page. The citations in this Order are to the CM/ECF page numbers.

and (3) he has not reviewed any "empirical evidence . . . that states a likelihood of recovering either fingermarks or DNA from firearm evidence in similar or dissimilar circumstances." *Id.*

a)      **Qualification**

Plaintiff argues that Dr. Hough is not a criminalist, fingerprint expert, or a DNA expert and, therefore, he is not qualified to render opinions concerning whether it is the norm to find or recover latent fingerprints or DNA of value on firearms. [ECF No. 73, pp. 3-5, 9, 15]. She notes that Dr. Hough has attempted to obtain latent fingerprints from a firearm fewer than 10 times and has never collected DNA at a crime scene, only in an experimental capacity. *Id.* at 11, 15.

Defendants argue that Dr. Hough does not need to be an expert in fingerprint examination or a serologist "to opine on the frequency or commonness of collecting usable, forensic material from firearms during the course of a criminal investigation." [ECF No. 78, p. 8 (emphasis omitted)]. In Defendants' view, "[Dr. Hough] is merely opining that the inability to develop and to analyze a sufficient amount of forensic material from the firearm in this case is not unusual[.]" *Id.*

Defendants insist that Dr. Hough -- a crime scene investigation and police practices expert, who has personally processed hundreds of crime scenes -- is qualified to render these opinions. *Id.* at 7. They state that "Dr. Hough has personal knowledge and

expertise in the methods used to collect firearms at crime scenes and the frequency with which fingerprint or DNA evidence is generated from them." *Id.*

An expert may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Determining whether a witness is qualified to testify as an expert "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *J.G. v. Carnival Corp.*, No. 12-21089-CIV, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (quoting *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1314–16 (N.D. Ga. 2002)).

"The qualification standard for expert testimony is 'not stringent,' and 'so long as the expert is *minimally* qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (emphasis added) (quoting *Kilpatrick v. Breg, Inc.*, Case No. 08-10052-CIV, 2009 WL 2058384 (S.D. Fla. June 25, 2009)). "[A]n expert must satisfy a *relatively low* threshold, beyond which qualification becomes a credibility issue for the jury." *J.G.*, 2013 WL 752697, at *3. (emphasis supplied) (citation omitted).

Although the qualification prong of *Daubert* is not demanding, the party proffering the expert must still "show that his expert is qualified to testify competently regarding the matters he intend[s] to address[.]" *Frazier*, 387 F.3d at 1260 (citation and internal quotation marks omitted).

Courts have allowed fingerprint examiners to testify about the probability of recovering fingerprints on a firearm based on experience. *See, e.g.*, *United States v. McNeil*, No. 3:09CR320, 2010 WL 56096, at *2 (M.D. Pa. Jan. 5, 2010) (permitting "[a]n examiner from the Pennsylvania State Police Bureau of Forensic Services [who] tested the firearm for the presence of latent fingerprints and found no prints on the weapon" to testify about "why no latent [finger]print appeared on the firearm, and cite to other cases in which she has experience or is aware of in that effort", noting that "[t]o the extent that the expert has knowledge of the frequency of firearms without latent prints, the expert could testify to that knowledge"); *United States v. Mack*, No. 3:13-CR-00054, 2014 WL 7404763, at *1 (D. Conn. Nov. 7, 2014) (permitting FBI latent fingerprint examiner to provide expert testimony concerning the probability of recovering usable latent fingerprints from a firearm).

Dr. Hough is not a fingerprint examiner and is not a DNA expert. He has attempted to obtain latent fingerprints from a firearm himself (though this direct experience is fewer than ten times) and has never collected DNA at a crime scene.

Dr. Hough became a law enforcement officer in 1979 and has continuously trained law enforcement officers since 1980. [ECF No. 73-1, p. 3]. He states in his report that he has "processed and collected evidence, **including fingermarks**, from hundreds of crime scenes" and "trained officers in such evidence-gathering techniques and the attendant pitfalls." *Id.* at 4 (emphasis added).

13

Dr. Hough has been qualified to testify about criminal investigations and police procedures and has been permitted to testify as an expert in those areas by other courts. *See*, *e.g.*, *Shew v. Horvath*, No. 8:16-CV-766-T-33JSS, 2017 WL 632515, at *3-4 (M.D. Fla. Feb. 16, 2017) (finding Dr. Hough to be qualified as "an expert in law enforcement procedures" and "qualified on the matter of criminal investigations generally"); *Rivera v. Ring*, 810 F. App'x 859, 863 (11th Cir. 2020) ("Dr. Hough was qualified in the sub-area of police-trained dogs[.]").

To be sure, "[e]xpertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1368 (11th Cir. 2014). Here, Dr. Hough has (but barely) sufficient background, training, experience and knowledge to opine that it is the norm not to find fingerprints of value on firearms. He does not have sufficient expertise to provide an opinion about DNA evidence, however.

Dr. Hough has "taught investigative methods for patrol and detectives for more than thirty years", "includ[ing] crime scene processing and management techniques and principles." [ECF No. 73-1, p. 4]. He has "performed crime scene processing and collection, fingerprint processing and submission" and "taught others in the procedures during the course of actual and simulated criminal investigations." *Id*. As noted, Dr. Hough states in his report that he has "processed and collected evidence, **including fingermarks**, from hundreds of crime scenes" and "trained officers in such evidence-gathering techniques and the attendant pitfalls." *Id.* (emphasis added).

14

"An expert is not necessarily unqualified simply because [his or] her experience does not precisely match the matter at hand." *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). Moreover, Dr. Hough is not seeking to opine on the process for recovering fingerprints, provide fingerprint analysis, or opine on whether proper collection methods and laboratory procedures for fingerprints were followed in this case.

Dr. Hough only barely passes muster on the qualifications factor. But, Plaintiff will be able to vigorously and comprehensively cross-examine him in an effort to demonstrate his less-than-comprehensive involvement in personally handling fingerprint evidence. There is ample ammunition for Plaintiff to use during trial to attack Dr. Hough's opinion about the frequency of finding or recovering latent fingermarks of value on firearms.[6]

But Dr. Hough's purported qualifications to render opinions about DNA collection are weaker than his qualifications in the fingermark collection field. Focusing on the obvious deficiencies, he is not a DNA expert and he has absolutely no experience collecting DNA from a crime scene. Therefore, Dr. Hough is not qualified to testify concerning Opinion 2.

---

[6]     *Cf. United States v. Phillips*, 146 F. Supp. 3d 837, 843–44 (E.D. Mich. 2015) ("[I]t wouldn't be a problem for [fingerprint expert] to briefly explain that, in his own experience, failing to obtain a good fingerprint was a relatively common occurrence."). If Dr. Hough has direct experience in not obtaining usable fingermarks from firearms, then he may include that in his expert testimony (subject, of course, to cross-examination designed to undermine the significance of that experience).

If Defendants wanted to obtain expert opinions from a DNA expert, then they could have retained one. They did not, opting instead to try to broaden Dr. Hough's credentials to include DNA. But the mere fact that Dr. Hough has previously been qualified as an expert on police procedures in certain settings does not automatically confer upon him the qualifications to offer opinions about anything and everything that police officers, investigators and forensic technicians do when investigating criminal activity.

For instance, an expert in foreclosures is not automatically qualified to testify about loan servicing. *See Wivell v. Wells Fargo Bank, N.A.*, No. 6:12-CV-3457-DGK, 2015 WL 6457760, at *4 (W.D. Mo. Oct. 26, 2015) (witness who had "some expertise in foreclosures" was not qualified to testify about loan servicing because "loan servicing [was] not a specialty or subset of foreclosure expertise").

Likewise, a pharmacist may not be qualified to testify about warning labels on prescription medication simply because he or she has experience dispensing prescription drugs. *See Wehling v. Sandoz Pharms. Corp.*, 162 F.3d 1158 (4th Cir. 1998) ("The record supports the conclusion that McBay was unqualified to testify as to the adequacy of the warning appearing on Clorazil's package insert. McBay testified that he has never been involved with the drafting, regulation, or approval of product labeling for any prescription medication, and he has no training in this area. Without more, his experience

as a pharmacist, reading prescription labels and dispensing drugs, does not qualify him to testify about the adequacy of drug warnings.").

Dr. Hough has the minimum qualifications to offer an expert opinion about the norm of not finding fingermark evidence on firearms -- but that does not extend to DNA.

Finally, Dr. Hough is permitted to testify about Opinion 5, as it is not an actual opinion; it is merely a fact concerning the results of his research (i.e., he did not find any materials on the point during his research). Plaintiff may cross-examine Dr. Hough about the scope of his search and the specific circumstances (e.g., search terms, duration of search, number of searches, etc.).

### b)   Reliability

Plaintiff also seeks to exclude Opinions 1 and 2 as "rank speculation", "not scientifically verifiable", and "unreliable." [ECF No. 73 at p. 3].[7] Plaintiff argues that Dr. Hough "lacks the specialized skill, expertise, and knowledge to make an *independent* determination that it is the norm not to find or recover latent fingermarks of value on firearms" and "any opinions regarding the likelihood of obtaining DNA or fingerprints from the firearm come not from his own expertise, but from speculations and conjecture and no firsthand knowledge." [ECF No. 83, pp. 3-4 (emphasis added)].

---

[7]   Plaintiff also deems Opinion 5 to be "rank speculation," but, as explained above, Opinion 5 is not actually an *opinion* and the challenge to it is denied as inapplicable.

Defendants respond that Dr. Hough's opinions meet the reliability prong of *Daubert*. They note that Opinions 1 and 2 are "based on Dr. Hough's review of the Miami-Dade Police Department's entire investigative file including the forensic reports, which detail the collection and testing processes used on the weapon collected from within inches of Mr. Foster's hands at the scene." [ECF No. 78, p. 4].

Defendants further note that Dr. Hough's report "cites twenty-two different studies and peer-reviewed publications in support of Opinions 1, 2, and 3." *Id.* at 5 (emphasis omitted).[8] Defendants state that included in these citations are "numerous statistics and data on the frequency of developing latent fingerprints and DNA from firearms." *Id.*

Defendants quote Dr. Hough's report which states, "[v]arious studies have . . . results of 12% usable prints, a study of recovery rate[s] specifically found recover[y] rate[s] from semi-automatic pistols to be 2.20%, and for magazine[s] 10%" and "[e]ven in an experiment using individual[s] of all ages in a controlled environment gripping a plastic syringe, adults in the age range 21-60 years old, only left sufficient DNA for a full profile in 25% of cases." *Id.* (quoting [ECF No. 73-1, pp. 9, 12]).

---

[8]     Two of the twenty-two citations concern Opinion 3 (the CSI Effect). The Undersigned will address the CSI Effect in a separate section.

The absence of fingerprint or DNA evidence is a proper subject matter for a properly qualified expert to opine upon, assuming that the methodology is reliable. As one court observed:

> The absence of fingerprint evidence is permitted in expert witness testimony. "We see little difference between a forensic expert testifying as to the reasons for not finding bodily fluid evidence on a rug, and the common situation of a fingerprint expert testifying as to the reasons for not finding a defendant's fingerprints on an object in question." [*United States v. Conroy*, 424 F.3d 833, 839 (8th Cir. 2005)]. *See also United States v. Ellis*, 817 F.3d 570, 577 (8th Cir. 2016) ("[T]he government's experts explained why DNA and fingerprint evidence may be difficult to recover from a firearm, and the jury was entitled to consider these explanations in reaching its conclusion that Ellis possessed the firearm despite the absence of DNA and fingerprint evidence."); *United States v. Bridgeforth*, 772 Fed. Appx. 371, 373 (8th Cir. 2019) ("As a government witness explained, firearms rarely provide fingerprint evidence[.]").

*United States v. Villanueva*, No. CR17500490203JLV, 2021 WL 4086534, at *3 (D.S.D. Sept. 8, 2021).

Moreover, Dr. Hough's report cites several studies concerning the infrequency of locating fingerprints on firearms. Thus, Plaintiff's characterization of Opinions 1 and 2 as "rank speculation", "not scientifically verifiable", and "unreliable", [ECF No. 73, p. 3], is unfounded. "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341. Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

Opinion 1 (about fingermark evidence) will assist the trier of fact because the average lay person is not familiar with how frequently or infrequently fingerprints of value are recovered from a firearm. "[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262.

The same analysis cannot be applied to the absence of DNA, however.

In *Frazier*, the Eleventh Circuit affirmed, in an *en banc* decision, the district court's exclusion of some of the opinion testimony of a forensic investigator and former police officer (Tressel) because he failed to sufficiently explain how his experience related to his opinion testimony. 387 F.3d at 1264-65.

*Frazier* involved a kidnapping and sexual assault. *Id.* at 1249. The victim was taken to the hospital where she was examined and a rape kit was prepared. *Id.* at 1251. No hair or fluid evidence was recovered from the victim that matched the defendant. *Id.* The defendant sought to introduce expert testimony through Tressel

> that none of Frazier's hairs or bodily fluids were recovered from the victim, her clothes or her car; that **"it would be expected that some transfer of either hairs or seminal fluid would occur in this case,"** and that "there is no forensic evidence to substantiate the claim of rape in this case."

*Id.* at 1252 (citation to the record omitted; emphasis added). The district court excluded Tressel's opinion as unreliable. *Id.* at 1264.

The Eleventh Circuit affirmed this ruling. It took issue with the meaning of Tressel's opinion that "the recovery of inculpatory hair or seminal fluid 'would be

expected'", observing that "[t]he specific meaning of the opinion is impossible to discern." *Id.* at 1265. The appellate court further criticized the opinion because it lacked a reliable foundation:

> More fundamentally, even if we take Tressel's opinion to mean simply that it was more likely than not that hair or seminal fluid would be transferred, and therefore recovered, **Tressel offered precious little in the way of a reliable foundation or basis for his opinion**. After the government moved to exclude Tressel's expert testimony, the district court was obliged to exercise its gatekeeping role by determining whether Tressel provided a reliable foundation or basis for his opinion. **When questioned specifically about the basis for his opinion, Tressel said his opinion was based on his experience, and on various texts in forensic investigation**. However, even after repeated prompting, **Tressel never explained just how his own experience, or the texts he mentioned, supported his "expectancy" opinion**. Indeed, **Tressel identified only a single investigation he had worked on in which hair evidence was recovered during the investigation of a serial rapist, and could suggest no study that had ever examined the rate of transfer of hair in sexual assault cases**.

*Id.* at 1265 (emphasis added).

The Undersigned agrees with Plaintiff that, at least with respect to DNA evidence,[9] Dr. Hough's opinion is not reliable. Dr. Hough cites some studies addressing the recovery rate of DNA. For instance, Dr. Hough cites an experiment involving plastic syringes where sufficient DNA for a full profile was recovered 25% of the time. [ECF No. 73-1, p. 12]. However, he fails to explain what methodology, if any, he employs to extrapolate the

---

[9]   Unlike the DNA studies cited by Dr. Hough, the fingerprint studies cited by Dr. Hough **do** specifically relate to firearms. [ECF No. 73-1, p. 9 ("Various studies have borne out this reality with results of 12% usable prints, a study of recovery rate specifically found recovery rate from semi-automatic pistols to be 2.20%, and for magazine[s] 10%.")].

results of that study using plastic syringes to the recovery of DNA on firearms. Dr. Hough also cites a study where "[t]he recovery of DNA through saliva or blood, even cigarette butts, has been found to be higher than the reported 3.5% for cells" but does not tie that study specifically to firearms. *Id.* at 13. Like the expert in *Frazier*, Dr. Hough has not established a reliable foundation for his opinion that it is the norm not to find or recover DNA of value from firearms.

In sum, Dr. Hough is not qualified to render Opinion 2. Additionally, Defendants have failed to show that Dr. Hough's opinion about DNA evidence is reliable.

### 2.      The CSI Effect (Opinion 3)

Dr. Hough also seeks to testify on the so-called "CSI Effect." [ECF No. 73-1, pp. 14-15, 17]. He opines that "[t]he modern citizen has watched many television shows and movies that incorporate entertainment portrayals of forensic techniques. This baseline of inaccurate and incomplete knowledge can result in unrealistic justice system expectations." *Id.* at 17.

Plaintiff seeks to exclude this opinion based on qualification and reliability grounds. [ECF No. 73, pp. 15-16]. Plaintiff characterizes this opinion as "mere argument, rhetoric, and personal opinion." *Id.* at 6. She states that Dr. Hough is not an expert in this area and that his opinion is not based on sufficient facts or data and is not the product of reliable principles and methods. *Id.* at 16.

Defendants argue that Dr. Hough cites "peer-reviewed publications in support of his opinion on the 'CSI Effect'", including "Dr. Hough's own publication on the topic." [ECF No. 78, p. 5]. Thus, according to Defendants, "this opinion is supported by academic authority." *Id.* at 6.

Defendants also assert that "federal courts have repeatedly acknowledged the CSI Effect and, in fact, [have] permitted expert testimony on this issue." *Id.* at 6-7 (discussing *Jones v. Warden, Washington Corr. Ctr. Franklinton, La.*, No. CIV.A. 12-1012, 2012 WL 5472553, at *18 (E.D. La. Sept. 13, 2012), report and recommendation adopted, No. CIV.A. 12-1012, 2012 WL 5467744 (E.D. La. Nov. 9, 2012) and *United States v. Fields*, 483 F.3d 313, 355 n.39 (5th Cir. 2007)).

Despite Defendants' bold assertion concerning the admission of expert testimony on the CSI Effect in *federal* court, the two cases cited by Defendants do not support this contention.

*Jones* concerned a petition for writ of habeas corpus under 28 U.S.C. § 2254. Given the nature of that case, it cannot support Defendants' claim about *federal* courts permitting expert testimony on the CSI Effect, as any admissibility determinations would have been made by the state court.

In *Fields* -- the other case cited by Defendants -- the Fifth Circuit commented on the CSI Effect, not because it is a widely accepted topic of expert testimony, but to provide context for the trial court's admission of certain photographs:

> The crime scene photos were necessary to rebut [defendant]'s arguments. They helped explain why little physical evidence was found: because it had been carried away by animals or worn away by the elements. In this age of the supposed "CSI [E]ffect," explaining to the jury why the Government had little in the way of physical or scientific evidence was arguably critical to the Government's case.

483 F.3d at 355 (footnote omitted).

Defendants further argue that Dr. Hough's testimony on the CSI Effect "will assist the jury in understanding why there was no DNA or latent fingerprints developed from the firearm" and "supports Dr. Hough's other opinions that it is normal not to recover DNA or fingerprints from a crime scene, despite the contrary portrayal of criminal investigations on television." *Id.* at 7.

Plaintiff maintains that Opinion 3 is speculative and will only confuse the jury:

> Who is the modern citizen? What percentage of people watch shows and movies that incorporate portrayals of forensic techniques? How often do juries rely on this information when deliberating? All of these matters are not addressed by Dr. Hough. This opinion is not tested or backed by any empirical data. In fact, the expert report does not offer any studies or data to back the opinion by Dr. Hough, aside from a report, written by Dr. Hough himself.

[ECF No. 83, p. 5 (citation to the record omitted)].[10] Plaintiff insists that "[t]he CSI [E]ffect is not a hard science and has no empirical data or science to back it. Therefore, this opinion by Dr. Hough should also be excluded." *Id.* at 6.

---

[10]     Dr. Hough also cites to an article, Heinrick, J. (2006). Everyone's An Expert: the CSI Effect's Negative Impact on Juries. The International Journal of Science, Society, and Law, 3(1). [ECF No. 73-1, p. 15, n.30].

Dr. Hough's opinion concerning the CSI Effect must be excluded under *Daubert*. Dr. Hough is not qualified to render opinions on the CSI Effect. He is a crime scene investigation and police practices expert. Dr. Hough has co-authored a book, *American Homicide*,[11] which covers *many* topics including -- based on excerpts quoted in Dr. Hough's report -- the CSI Effect. [ECF No. 73-1, pp. 14-15]. However, Defendants have not shown that there is anything in Dr. Hough's education, background, training, and/or experience which qualify him to testify as an expert concerning the television and movie viewing habits of the "modern citizen" or how those habits affect his or her expectations/views of the justice system.

Dr. Hough's Opinion 3 must also be excluded as unreliable. In *Fields*, the Fifth Circuit quoted an article describing the CSI Effect as follows:

> The 'CSI [E]ffect' is a term that legal authorities and the mass media have coined to describe a supposed influence that watching the television show CSI: Crime Scene Investigation has on juror behavior. Some have claimed that jurors who see the high-quality forensic evidence presented on CSI raise their standards in real trials, in which actual evidence is typically more flawed and uncertain.

483 F.3d at 355, n.39 (quoting Tom R. Tyler, Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction, 115 YALE L.J. 1050, 1050 (Mar. 2006)).

---

[11]    Dr. Hough cites two sources in the portion of his report discussing the CSI Effect, including his book, Hough, R.M., and McCorkle, K.D., American Homicide (2d ed.), Los Angeles: SAGE. [ECF No. 73-1, pp. 14-15, nn. 28, 30].

Importantly, the author of that article "explains that the existence of a 'CSI [E]ffect' is plausible but **has not been proven empirically**." *Id.* (emphasis supplied).

Defendants claim Dr. Hough cites "peer-reviewed *publications* in support of his opinion on the 'CSI Effect'", including "Dr. Hough's own publication on the topic." [ECF No. 78, p. 5] (emphasis added).

Dr. Hough cites a total of *two* sources in the section of his report discussing the CSI Effect: (1) his own book addressing *many* topics, including the CSI Effect and (2) a three-page article published in The Triple Helix: The International Journal of Science, Society, and Law. [ECF No. 73-1, pp. 14-15, nn. 28-30].[12] First, Dr. Hough's book is *not* a peer-reviewed publication. Second, Defendants' counsel has not demonstrated that The Triple Helix: The International Journal of Science, Society, and Law is a peer-reviewed journal.[13]

_____

[12]   Dr. Hough cites this article in his report as "Heinrick, J. (2006). Everyone's [A]n [E]xpert: the CSI [E]ffect's [N]egative [I]mpact on [J]uries. The International Journal of Science, Society, and Law, 3(1)" and in his book as "Heinrick, J. (2006). Everyone's [A]n [E]xpert: the CSI [E]ffect's [N]egative [I]mpact on [J]uries. **The Triple Helix:** The International Journal of Science, Society, and Law, 3(1), 59-61." (emphasis added).

[13]   According to the Facebook page of the Arizona State University chapter, The Triple Helix appears to be an undergraduate student publication:

> The Triple Helix is an international non-profit organization with 27 chapters on five continents involving over 800 students from universities that include Yale, Harvard, London School of Economics, National University of Singapore and Cambridge. Its overall goal is to produce one of the highest quality undergraduate publications possible, and showcase the voices of hundreds of undergraduate students on some of the most pressing modern issues in the interactions between science and society. This unprecedented student-run forum for discussion and interdisciplinary

Thus, Defendants' claim that Dr. Hough cites "peer-reviewed publications in support of his opinion on the 'CSI Effect'", [ECF No. 78, p. 5 (emphasis added)], is unfounded.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *GE v. Joiner*, 522 U.S. 136, 146 (1997). Here, there is no indication that Dr. Hough's discussion of the CSI Effect in his book is based on his own scholarly research, independent testing, interviews, focus groups, etc.

Dr. Hough's opinion on the CSI Effect (Opinion 3) must be excluded on qualification and reliability grounds.

### 3.     Location of Officer Green When He Discharged His Firearm (Opinion 4)[14]

---

thought enables students with a diversity of intellectual interests and backgrounds from all over the world to collaborate and communicate.

https://www.facebook.com/asutriplehelix/ (last visited June 6, 2022).

[14]     Defendants state that they intend to elicit Opinion 4 from Dr. Hough only if Plaintiff calls Terrycal Rogers, a witness who claims to have observed a second shooting, to testify at trial. [ECF No. 78, pp. 1, nn.1, 2]. According to Ms. Rogers, one of the officers fired his weapon while standing outside the police vehicle. *Id.* at 9. Thus, Opinion 4 -- that Officer Green was inside of his vehicle when he fired the shots -- is intended to rebut Ms. Rogers' account of the events.

Lastly, in Opinion 4, Dr. Hough states that "[b]ased on the physical and testimonial evidence furnished to [him], Officer Green was inside of his assigned patrol car when he fired at Mr. Foster." [ECF No. 73-1, p. 17].

Plaintiff argues that Dr. Hough is not qualified to opine on the location of Officer Green at the time of the shooting because Dr. Hough is not an accident or crime scene reconstructionist or a ballistics expert.[15] [ECF No. 73, p. 7]. Plaintiff further argues that Dr. Hough's opinion on Officer Green's location is not reliable because Dr. Hough did not conduct any scientifically controlled experiments and ignored unfavorable evidence[16] in favor of "the cherry-picked police version of the shooting investigative file (i.e., statements, photographs, bullets, encasing, etc.)." *Id.* at 7, 9.

Plaintiff further argues that Opinion 4 must be excluded because Dr. Hough, impermissibly weighs-in on the credibility of Officer Green:

> Applied to this case, although Dr. Hough did not openly opine Green's testimony is truthful, he effectively did just that by concluding Green was

---

[15]    At least one court has referred to Dr. Hough, in passing, as a retained expert in ballistics, *Greer v. Ivey*, No. 6:15-CV-677-ORL-41GJK, 2016 WL 11464647, at *1 (M.D. Fla. Nov. 22, 2016), although it is unclear whether Dr. Hough *actually* testified as a ballistics expert in *Greer*, or any other case.

[16]    According to Plaintiff, Dr. Hough "relies almost exclusively on Officer Green's statement", "did not even consider Green's deposition", and did not "consider the entire physical scene, particularly Green's firearm shell casings found not inside . . . Green's service vehicle." [ECF No. 73, p. 14]. Defendants respond that Dr. Hough reviewed the entire Miami-Dade Police Department investigative file and that it was not necessary for Dr. Hough to review the officers' deposition testimony because the officers testified consistently with statements they provided to the Miami-Dade Police Department. [ECF No. 78, p. 4, n.6].

> inside the car when the shots were fired. . . . Dr. Hough must be prohibited from testifying that Green was inside the car when he shot Mr. Foster. The testimony is not helpful to the jury because it is for the jury to decide whether Green's claim of self-defense is genuine or contrived. Any claim by the expert that Green's account is supported by the physical evidence invites the jury to ignore key factual discrepancies in the shooting officer's account of what happened, which is full of conflicts and differs from eyewitness accounts of what transpired.

*Id.* at 14.

Defendants respond that Dr. Hough does not need to be an accident reconstructionist because he is not offering a reconstruction of the scene. [ECF No. 78, p. 9]. According to Defendants, "[b]ecause Dr. Hough is unquestionably qualified as an expert in crime scene investigations and police practices—in addition to his knowledge of how weapons are fired and shell casings are ejected—his opinion that [the] location of the shell casings is consistent with Officer Green firing from inside the vehicle meets the standards of *Daubert*." *Id.* at 10.[17] Defendants further challenge Plaintiff's claim that Dr. Hough relied exclusively on the police version of the events, noting, for example, that Dr. Hough discusses witness statements in his report. *Id.* at 9.

In her reply, Plaintiff maintains that Opinion 4 is "entirely within the scope of an accident reconstructionist" and must be excluded. [ECF No. 83, p. 3].

---

[17]     Dr. Hough does not opine that the locations of the spent casings are *merely* "consistent" with Officer Green having fired his weapon from inside the vehicle. He unequivocally concludes that "[b]ased on the physical and testimonial evidence furnished to [him], Officer Green **was** inside of his assigned patrol car when he fired at Mr. Foster." [ECF No. 73-1, p. 17 (emphasis added)].

Dr. Hough is not qualified to opine on the location of Officer Green at the time of the shooting based on photographs of spent casings or any other evidence. Dr Hough is not an accident reconstructionist. *See Knight v. Miami-Dade Cnty.*, No. 09-23462-CIV, 2014 WL 11813876, at *8 (S.D. Fla. May 14, 2014) (police practices expert was not permitted to "testify regarding any ballistics, bullet projectile, or accident reconstruction issues"); *Krause v. Cnty. of Mohave*, 459 F. Supp. 3d 1258, 1266 (D. Ariz. 2020) ("[D]ecades of experience as a law enforcement officer, competitive shooter, and gunsmith [could not] replace qualifications in ballistic forensics and [did] not qualify [police practices expert] to opine on the highly technical area of bullet path reconstruction or ballistics.") (cleaned-up); *Dominguez v. City of Los Angeles*, No. CV174557DMGPLAX, 2018 WL 6164278, at *8 (C.D. Cal. Oct. 9, 2018), aff'd, 836 F. App'x 489 (9th Cir. 2020) ("Reading a coroner's report does not transform a police practices expert into an expert on bullet trajectory analysis.").

While Dr. Hough may have knowledge of how weapons are fired and shell casings are ejected based on his police training and experience, in general, Defendants do not explain how that knowledge qualifies Dr. Hough to opine on the location of a shooter based on photographs of spent shell casings or other evidence.

Opinion 4 must also be excluded as unreliable. In *Haegele v. Judd*, for instance, the court excluded the opinions of an expert (Boswell) concerning the positions/movement of two sheriff deputies (Hick and Green) during a shooting based on an analysis of shell

casings. No. 8:19-CV-2750-T-33CPT, 2020 WL 6873378, at *5 (M.D. Fla. Nov. 23, 2020). The

Court determined that:

> [M]uch of Boswell's methodology [was] unreliable. First, **Boswell's methodology for estimating Hicks and Green's positions based on the shell casings [was] unreliable. Boswell did not test Hicks and Green's firearms — or even the same type of firearms — to determine the distance shell casings are typically ejected from those weapons. Nor ha[d] Boswell referred to any literature regarding the reliability of the testing of shell casing ejection patterns.** *See United States v. Fultz*, 18 F. Supp. 3d 748, 757–58 (E.D. Va. 2014)(excluding firearms and shooting scene reconstruction expert's testimony because the expert "did not indicate at trial whether a method for determining the origin of a gunshot from the location of spent casings has been (or can be) tested, nor did he indicate whether such a method has been subjected to peer review and publication," failed to identify "any literature supporting the theory that one could determine the origin of a shot based on the location of shell casings at a crime scene," and failed to address "the known or potential error rate of [his] chosen method of determining shooter location"). Furthermore, **there [was] no information regarding Boswell's methodology in determining Hicks and Green's supposed movement while shooting based on the shell casings.**
>
> **Thus, the Court conclude[d] that Boswell's testimony regarding the shell casings and the supposed meaning of their placement [was] unreliable.** *See Mighty v. Miami-Dade County*, No. 14-23285-CIV, 2019 WL 4306942, at *5 (S.D. Fla. Aug. 9, 2019) (finding an expert's methodology in conducting an "ejection pattern analysis to reach his conclusion regarding the location of Officer Carballosa when he fired his weapon" unreliable where the expert had done testing — actually shooting the weapon at issue and measuring how the shell casings fell — but could not explain the reliability of this testing method or "point to any literature that explains the circumstances when offhand shooting is a reliable methodology"), report and recommendation adopted, No. 14-23285-CIV, 2019 WL 4305847 (S.D. Fla. Sept. 10, 2019). Thus, Boswell [could] not testify on Hicks and Green's supposed positions or movements based on the shell casings.

*Id.* (emphasis added).

Here, there were six spent casings found inside Officer Green's police vehicle, one spent casing found on Officer Green's gun belt, and one spent casing found on the ground outside the police vehicle. Dr. Hough's report does not specifically address the spent casing found on Officer Green's gun belt or the spent casing found on the ground outside the police vehicle. [ECF No. 73-1, pp. 15-17].

While Dr. Hough seeks to opine that Officer Green fired his weapon from inside his vehicle, based, in part, on photographs taken by Miami-Dade County Police Department investigators of what are assumed to be the final resting places of each spent casing, his opinion is not reliable because, like the expert in *Haegele*, Dr. Hough did not conduct any tests or address the reliability of determining a shooter's location based on photographs of spent casings.[18]

Dr. Hough's Opinion 4 must be excluded on qualification and reliability grounds.

In sum, Dr. Hough may not provide expert testimony on finding or recovering DNA of value on firearms (Opinion 2), may not opine on the CSI Effect (Opinion 3), and may not opine on the location of Officer Green when he discharged his firearm (Opinion 4). Dr. Hough will be permitted to testify at trial that it is the norm not to be able to find

---

[18]     The Undersigned notes that Defendants seek to exclude Plaintiff's rebuttal expert, Dr. Knox, as unreliable because "Dr. Knox has not relied on any data, did not conduct any measurements, and did not create any reconstructions . . ." [ECF No. 71, p. 5]. Defendants' own expert, Dr. Hough, did not rely on any data, did not conduct any measurements, and did not create any reconstructions. Therefore, using Defendants' own metric, Dr. Hough must (like Dr. Knox) be excluded on reliability grounds.

or recover latent fingerprints of value on firearms (Opinion 1) and Opinion 5 (a non-opinion), concerning the results of his search for empirical evidence.

### B.   Defendants' *Daubert* Motion

Defendants seek to exclude the opinions of Plaintiff's rebuttal expert, Dr. Knox, in their entirety. [ECF No. 71]. Defendants do not challenge Dr. Knox's qualifications. *Id.* at 4. Instead, they argue that Dr. Knox's opinions should be excluded because they will not assist the jury and are not based on reliable principles or methods.[19] *Id.*

Dr. Knox has rendered the following rebuttal opinions in this case:

RQ1: **The six fired cartridge cases were all documented as being inside the police vehicle**. Assuming that the documented locations are the organic final rest locations of the six fired cartridge cases, **it is possible that all of them were fired from outside the vehicle. It is also possible that any number of them were fired from outside the vehicle if the pistol was held near the open passenger window**; therefore, the null hypothesis is not rejected: **the shots, in total or in any proportion thereof, could have been fired from either inside or outside the vehicle**.

RQ2: **The single fired cartridge case (YM #4) that was on the ground outside the police vehicle was approximately two to three feet laterally from the right front door**. It is assumed that the documented location of the fired cartridge case is its organic location of final rest. **Though empirical**

---

[19]    In their motion, Defendants also argue that Dr. Knox should be precluded from testifying about the report of Dr. John Marraccini, a consultant retained by Plaintiff. [ECF No. 71, p. 7]. Although the parties disagree on whether this topic was addressed at the parties' Local Rule 7.1(a)(3) conferral, this argument is moot as Plaintiff states that "Dr. Knox did not rely on Dr. Marraccini's report because the report was admittedly speculative." [ECF No. 80, p. 5 (citing Dr. Knox's Deposition Transcript [ECF No. 71-2, pp. 8-10])]; *see also* [ECF No. 81, p. 2 ("Regardless of whether Dr. Marraccini's report came up during the Parties' meet and confer (which [Defendants' counsel] believed it did and was an oversight if this specific issue did not arise), Plaintiff's Response makes clear that the issue is moot.")].

testing data indicate that the probability of a fired cartridge case fired out the window of a vehicle is low, the possibility that the fired cartridge came out of the window when the pistol was fired from inside the vehicle cannot be excluded; therefore, the null hypothesis is not rejected: **the shot associated with this fired cartridge case could have been fired from either inside or outside the vehicle**.

RQ3: **The single fired cartridge case found on Officer Green's gun belt is assumed to have been deposited on the gun belt organically during the shooting incident**. Based on that assumption, and given the fact that the fired cartridge case was not discovered until after Officer Green had left the scene, the location of firing is indistinguishable; therefore, the null hypothesis is not rejected: **the shot associated with this fired cartridge case could have been fired from either inside or outside the vehicle**.

***

In both his report and his deposition, Dr. Hough commented that it is common to not find fingerprints or DNA on a firearm. Developing useable fingerprints or DNA profiles from firearms is plagued by high degrees of both aleatory and epistemic uncertainty; therefore, false negative results, i.e., not finding the DNA or fingerprints of a person who touched the firearm, occur with some frequency. However, **it is scientifically inappropriate to conclude that the absence of fingerprints or DNA evidence on a firearm due to aleatory or epistemic uncertainty (false negative) is any more probable than that it is due to the firearm having not been touched by a particular individual (true negative)**.

[ECF No. 71-1, pp. 6-7 (emphasis added)].

### 1.  Officer Green's Location at the Time of the Shooting

Defendants contend that Dr. Knox's opinions concerning the location of Officer Green when he discharged his firearm do not satisfy the reliability prong of *Daubert*. [ECF No. 71, p. 5]. Defendants note that: "Dr. Knox has not relied on any data, did not conduct any measurements, and did not create any reconstructions . . . ." *Id*. Defendants further

note that Dr Knox "is merely opining that it is *possible* that Officer Green's firearm was fired outside of the vehicle, but he cannot state where Officer Green would had to have been standing outside the car to hit Mr. Foster in relation to where the cartridges landed." *Id.* at 5 (emphasis supplied).

Plaintiff points out that "Dr. Hough and Dr. Knox rely on the same set of data, evidence, and measurements—that [were] collected by the Miami-Dade Police Department during the shooting investigation." [ECF No. 80, p. 3 (citing expert reports)]. In other words, "Dr. Knox rebuts Dr. Hough's opinion, using the same data and information Dr. Hough relied on." *Id.* Plaintiff thus reasons that "[i]f Dr. Hough is allowed to testify that Officer Green was inside his patrol car when he fired at Mr. Foster based on information provided by MDPD, Dr. Knox will merely testify that Green was outside the car." *Id.* at 4.[20]

---

[20]     Dr. Knox does not actually opine that Officer Green was outside his vehicle at the time of the shooting. Rather, Dr. Knox opines that it is *possible* that Officer Green was outside his vehicle at the time of the shooting; he also opines that it is *possible* Officer Green was *inside* his vehicle at the time of the shooting. [ECF No. 71-1, pp. 6-7 (opining that the six casings recovered from inside the vehicle "in total or in any proportion thereof, could have been fired from either inside or outside the vehicle"; the casing found outside the police vehicle "could have been fired from either inside or outside the vehicle", and the casing found in Officer Green's gun[ ]belt "could have been fired from either inside or outside the vehicle"].

In fact, during his deposition, Dr. Knox testified that in many cases, it is not possible to determine the specific location of the shooter based on the location of spent casings because of well-established uncertainties. [ECF No. 71-2, pp. 48:11-25, 49: 15].

Defendants state that Plaintiff's focus is misplaced because she addresses the admissibility of Dr. Hough's opinion when she should have addressed the admissibility of her own expert's opinion. [ECF No. 81, p. 3].

Defendants also contend that Dr. Knox's opinion concerning Officer Green's location at the time of the shooting will not assist the trier of fact because it is not *actually* rebuttal testimony:

> Dr. Knox's opinion on the location of the firearm cartridges purports to be a rebuttal opinion to that of Dr. Hough's opinion. Dr. Hough opined that the location of the firearm cartridges is <u>consistent</u> with Officer Green firing his weapon inside the vehicle. Thus, a rebuttal opinion would be that the location of the firearm cartridges is <u>inconsistent</u> with firing the weapon inside the vehicle. That is not, however, what Dr. Knox states (nor can he). Indeed, he concedes as he must that it is possible the weapon was fired inside the vehicle. Because this opinion is not, in fact, a rebuttal to any of Dr. Hough's opinions, it will not be helpful to the trier of fact.

[ECF No. 71, p. 6 (emphasis in original; citations to the record omitted)].[21]

Plaintiff responds to this argument by stating that Dr. Knox should be permitted to testify that Opinion 4 in Dr. Hough's report is incomplete because it ignores certain key evidence -- the two fired casings which were not located inside the vehicle. [ECF No. 80, pp. 4-5].

---

[21]    The Undersigned does not agree with Defendants' characterization of Dr. Hough's Opinion 4. Dr. Hough did not merely "opine[] that the location of the firearm cartridges is consistent with Officer Green firing his weapon inside the vehicle." [ECF No. 71, p. 6]. He concluded, unequivocally, that "[b]ased on the physical and testimonial evidence furnished to [him], Officer Green **was** inside of his assigned patrol car when he fired at Mr. Foster." [ECF No. 73-1, p. 17 (emphasis added)].

At the outset, Dr. Knox's opinion on this topic is moot because Dr. Hough's Opinion 4 has been excluded and, therefore, there is nothing for Dr. Knox *to* rebut. *See Caldwell v. City of San Francisco*, No. 12-CV-01892-DMR, 2021 WL 1391464, at *8 (N.D. Cal. Apr. 13, 2021) ("Because [expert]'s testimony is largely excluded, the rebuttal and reply opinions addressing that testimony are also excluded.").

Dr. Knox's opinion must also be excluded as unreliable because it suffers from the same infirmities as Dr. Hough's Opinion 4. Dr. Knox, like Dr. Hough, did not take any measurements, conduct any tests of Officer Green's firearm, or perform any scene reconstruction. Dr. Knox and Dr. Hough relied primarily on the *same* evidence -- the photographs of the spent casings taken by the Miami-Dade Police Department. Therefore, Dr. Knox (like Dr. Hough) cannot opine on the location of Officer Green at the time of the shooting.

### 2.    Fingerprints or DNA Evidence on a Firearm

Defendants argue that Dr. Knox's opinion concerning fingerprints or DNA evidence on a firearm should be excluded because "Dr. Knox did not rely on a single piece of data or any scientific principles or methods in reaching his opinion regarding the absence of fingerprints or DNA on a firearm" and "all of the literature upon which he relies in his report relates to firearms, not any fingerprint or DNA collection." [ECF No. 71, p. 5].

Plaintiff responds to this argument by stating that Defendants could have questioned Dr. Knox at his deposition about the data and scientific principles underlying this opinion but failed to do so. [ECF No. 80, p. 4].

While Plaintiff places the blame on Defendants for not examining Dr. Knox on the data and scientific principles underlying this opinion, as the proponent of the expert testimony, it is Plaintiff (not Defendants) who has the burden of meeting the *Daubert* standard. *See Allison*, 184 F.3d at 1306 (noting that the party proffering the expert also has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence"). Moreover, and as discussed below, the Undersigned agrees with Defendants that Dr. Knox's opinion concerning the absence of fingerprints or DNA evidence on firearms must be excluded under *Daubert*.

Defendants also argue that "Dr. Knox's commentary on the absence of DNA or fingerprints on a firearm will not assist the trier of fact" because Plaintiff can make the same observation during closing argument. [ECF No. 71, p. 7]. Defendants state that "it does not require expert testimony to know that the absence of DNA or fingerprint evidence on a firearm could be because no one touched it." *Id.* Plaintiff does not address this argument in her response.[22]

---

[22]    Plaintiff's failure to address this argument in her response concedes the point. *See, e.g., Ryder Truck Rental, Inc. v. Logistics Res. Sols., Inc.*, No. 21-21573-CIV, 2022 WL 1238665, at *9, n.4 (S.D. Fla. Apr. 14, 2022) (noting that "by failing to respond to [movant's]

Because Dr. Hough will not be permitted to opine concerning DNA evidence, Dr. Knox will not be permitted to present rebuttal testimony on this topic.

Additionally, Dr. Knox's opinion must be excluded for another reason: it is unhelpful. Dr. Knox's opinion is not based on any specialized education, training, or experience. During his deposition, Dr. Knox acknowledged that his opinion concerning the absence of fingerprints or DNA[23] on the firearm was not based on any literature, publications, or studies:

> Q. In the literature references upon which you rely in your report here on Page 8, all of those relate to firearms and case -- case pattern ejections --
>
> A. Yes.
>
> Q. -- is that accurate?
>
> A. Yes.
>
> **Q. Okay. So you do not rely on any literature regarding fingerprints – fingerprint collection?**
>
> **A. No, I'm not citing any numbers or anything like that**. I didn't -- In fact, **my commentary on it, it was just a clarification that I felt based upon what the -- Dr. Hough wrote in his report, that it was necessary to -- to clarify that it -- it can be because nobody touched the gun**. So that's all I'm

---

arguments on [an] issue, [the non-movant] has essentially conceded that it ha[d] failed to carry its burden of establishing that [its expert]'s opinion ha[d] any relevance to . . . [a specific] claim."). Nonetheless, the Undersigned will also address the merits of this argument.

[23]     As Defendants correctly point out, the evidence in this case was not that *no* fingerprints or DNA evidence were found on the firearm. It was that no *usable* latent fingerprints were obtained and the DNA testing was *inconclusive*. *See* [ECF No. 71, p. 7 (citing ECF Nos. 63-21; 63-27)].

commenting on in that.

[ECF No. 71-2, p. 28 (emphasis added)]. In other words, Dr. Knox's opinion is not based on specialized knowledge. **It is simply a common sense conclusion.**

Dr. Knox's opinion must be excluded because it will not assist the trier of fact. "[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262 (citation omitted).

Here, Dr. Knox is opining that it is just as probable that the reason fingerprints or DNA evidence is absent from a firearm is because a specific person did not touch that firearm. [ECF No. 71-1, p. 7]. This opinion is not expert testimony; it is common sense.

The jury does not need to hear testimony from an expert that it is just as probable that the reason a particular individual's fingerprints or DNA are not on a firearm is because that person did not touch the firearm. This common sense conclusion could just as easily be reached by the jury without the aid of purported expert opinion testimony. It is a matter of common sense that if a person did not touch an object, then his or her fingerprints or DNA will not be found on that object.[24]

In fact, Plaintiff obtained similar testimony from Defendants' expert, Dr. Hough:

Q. Okay. So let's say Edward Foster never possessed or touched the firearm.

---

[24] Of course, the Undersigned could conceive of circumstances where someone's DNA could be transferred to an object that person has not touched. However, that is not a concern here, where the Miami-Dade Police Department's Forensic Report reflects that the DNA testing was inconclusive. [ECF No. 63-27]. In any event, the jury does not need expert testimony to deduce that one reason a person's fingerprints or DNA are not found on a firearm is because that person never touched the firearm.

Let's say –let's say that Edward Foster never -- never had possession of and never touched that firearm. **The fact that Edward touched -- Edward Foster may not have touched the firearm, could that be an explanation as to why his fingerprints or DNA were not found?**

[Counsel for Defendants]: Form.

THE WITNESS: In -- in your hypothetical here about someone not touching a firearm being the reason for no prints, **in a general sense, that could be the case**.

[ECF No. 78-3, pp. 61-62 (emphasis added)].

There is "no need for an expert's opinion where the jury can decide a disputed issue through the application of common sense or simple logic in light of the evidence and testimony presented at trial." *Loc. Access, LLC v. Peerless Network, Inc.*, No. 6:14-CV-399-ORL-40TBS, 2016 WL 4466890, at *4 (M.D. Fla. Aug. 24, 2016) (citing *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001)). Here, there is nothing about Dr. Knox's opinion concerning the absence of fingerprints or DNA on a firearm which is beyond the common sense understanding of the average layperson. Accordingly, Dr. Knox's testimony concerning the absence of fingerprints or DNA evidence on firearms will not assist the trier of fact and must be excluded under *Daubert*.

In sum, Dr. Knox's opinions must be excluded because: (1) Dr. Knox's rebuttal opinion about DNA evidence is rendered moot by the exclusion of Dr. Hough's opinion on the same topic; (2) Dr. Knox's opinion concerning the location of Officer Green at the time of the shooting is excluded as unreliable for the same reasons as Dr. Hough's Opinion 4; and (3) Dr. Knox's opinion concerning fingerprints or DNA on a firearm is not

helpful to the jury.

**IV.**     **Conclusion**

For the reasons discussed herein, the Undersigned **grants in part (and denies in part)** Plaintiff's *Daubert* motion [ECF No. 73] and **grants** Defendants' *Daubert* motion [ECF No. 71].

**DONE AND ORDERED** in Chambers, in Miami, Florida, on June 8, 2022.

_____

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Robert N. Scola, Jr.
All Counsel of Record