United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Altagracia Banuchi, as personal representative of the estate of Edward Blanton Foster III, and on behalf of the survivors of the estate, E.F., J.F., A.D.F., N.F., M.F., and A.B.F., Plaintiff, <br><br> v. <br><br> City of Homestead and Anthony Green, Defendants. | Civil Action No. 20-25133-Civ-Scola |

### Order Granting the Defendants' Motion for Summary Judgment

The controversy in this case centers on, primarily, whether Edward Blanton Foster III was armed and drew his gun prior to being shot and killed by Homestead police officer Defendant Anthony Green. After two rounds of motions to dismiss, two claims remain: a § 1983 claim alleging excessive force against Green, under the Fourth Amendment; and a state-law battery claim under Florida's Wrongful Death Act, asserted against Green and, alternatively, the City of Homestead (the "City"). The Defendants now seek summary judgment, arguing Green is entitled to qualified immunity as to the § 1983 claim; Green is entitled to sovereign immunity as to the battery claim; and in any event, the battery claims against Green and the City are barred by Florida law. (Defs.' Mot. for Summ. J., ECF No. 60; Defs.' Stmt. of Facts, ECF No. 59.) Plaintiff Altagracia Banuchi, as personal representative of the estate of Edward Blanton Foster III, and on behalf of the survivors of the estate, E.F., J.F., A.D.F., N.F., M.F., and A.B.F., opposes the motion (Pl.'s Resp., ECF No. 65; Pl.'s Stmt. of Facts, ECF No. 64), arguing, principally, Green had no reasonable suspicion to support his initial investigatory stop of Foster and, thereafter, Green's use of lethal force was excessive because Foster was unarmed and, therefore, never a threat to Green. The Defendants have timely replied. (Defs.' Reply, ECF No. 68; Defs.' Reply Stmt., ECF No. 67.) After careful review, the Court finds the Defendants have carried their burden and Banuchi has not come forward with evidence establishing a genuine issue of material fact, requiring resolution of this case through trial. Accordingly, the Court **grants** the Defendants' motion for summary judgment (**ECF No. 60**).

1. **Background**[1]

On July 16, 2015, a dispatch call was transmitted through the City's police radio system, alerting that a "light-skinned male that was seen that had a firearm" "wearing red basketball shorts and a – a white or black shirt." (Defs.' Stmt. ¶ 1.) According to the dispatch, the armed man was seen in Blakey Park and then walking east. (*Id.*) Although the parties dispute which direction Green traveled from, neither side disputes that Green, alone, in uniform, and in a marked City police car, responded to the call and headed towards the referenced area, near the corner of Redland Road (which runs north/south) and Lucy Street (which runs east/west).[2] (*Id.* ¶¶ 4, 6; Pl.'s Stmt. ¶ 4; Ex F, Aerial Map View, ECF No. 58-6.) The aerial photo, below, depicts the intersection:



As Green neared the area, he saw Foster—"a light-skinned black male," "wearing a black shirt and red basketball shorts"— whose location and appearance matched the dispatch alert. (Defs.' Stmt. ¶¶ 8, 13, 16; Pl.'s Stmt. ¶

---

[1] Except where indicated, the facts are undisputed.

[2] In this order, the Court will use these street names but *Redland Road* is also called *SW 187th Avenue* and *SW 14th Avenue* and *Lucy Street* is also called *SW 328th Street* and *SW 8th Street*, throughout the parties' briefing and the record. (Defs.' Stmt. ¶¶ 3, 5.)

8 (disputing, again, the direction of Green's travel but not disputing Green's initial observation of Foster); ¶ 16.[3])

As the paths of the two men converged, Foster was walking towards the southeast, just east of Redland Road, towards the north face of an abandoned building (shown with a pink roof in the aerial photo, above) on the northeast corner of the intersection of Redland Road and Lucy Street. (Defs.' Stmt. ¶ 9.) To Green, Foster appeared nervous and agitated, walking at a quick pace and repeatedly looking over his left shoulder, with the left side of his shorts partially pulled down, as if holding a heavy object. (*Id.* ¶ 11.) In Green's experience, the appearance of Foster's gym shorts was consistent with someone carrying a firearm in their shorts. (*Id.* ¶ 12.) Green says that based on the totality of the circumstances, known to him at the time, he decided to conduct an investigatory stop. (*Id.* ¶ 17; *see also* Green Dep. at 150:7–9 (testifying that the area "has had its share of altercations and shootings").)

Green, in his squad car, approached Foster, with both front windows down, near the north end of the abandoned building. (Defs.' Stmt. ¶¶ 18, 22.) As he approached, Foster was startled. (*Id.* ¶ 19; Pl.'s Stmt. ¶ 69.) According to Green, he and Foster then made eye contact, as the front of Green's car pulled within less than ten feet of Foster. (Defs.' Stmt. ¶¶ 20–21.) Green then drew his gun, pointing it through the windshield, yelling to Foster, now directly in front of the car, "Please let me see your hands! Put your hands up!" (*Id.* ¶ 23.) Refusing Green's commands, and while facing the right side of the front of Green's car, Foster reached across the front of his body with his right hand and retrieved a gun.[4] (*Id.* ¶¶ 24–5.) Green's description of the gun was consistent with the gun that was later recovered from the scene. (*Id.* ¶¶ 26–27.)

After pulling the gun from his shorts, Foster held it in his right hand, pointing down, towards the front bumper/grill area of Green's car. (*Id.* ¶ 28.) As

---

[3] Although Banuchi appears to quarrel with whether Foster was actually "light skinned," she provides no record citation for her unsupported challenge. (Pl.'s Stmt. ¶ 16.) Accordingly, the Court finds the description of Foster's skin color, and Green's perception thereof, undisputed for the purposes of evaluating the Defendants' motion. Further, there is no dispute that the dispatcher described the person in the call as "light-skinned." Lastly, even if Banuchi's description of Foster as having a "medium complexion" *was* supported by the record, the Court finds the distinction immaterial: at bottom, Banuchi provides no basis to challenge the Defendants' position that Green's observations of Foster, as he approached the area, were consistent with the dispatch call's description.

[4] In his sworn statement, Green said Foster retrieved a gun from the waistband of his shorts, from the left side of his body. (Green Stmt. at 9.) In the deposition testimony the Defendants point to, however, Green said Foster "retrieve[d] the firearm from the right-side hip area." (Green Dep. 178:20–5.) Neither party has flagged this discrepancy as significant and, without more, the Court assumes Green misspoke when referencing Foster's right, as opposed to left, hip area.

Foster held the gun, Green began yelling to him, "Drop the gun!" (*Id.*) Hesitating for just a moment, Foster turned and began running along the north side of the abandoned building, eventually rounding the northeast corner. (*Id.* ¶ 29.) Green, with his gun still drawn, now pointed through the open passenger-side window, followed Foster, in his car, shouting at Foster to stop running and to drop his gun. (*Id.* ¶ 30.) Despite Green's commands, Foster moved the gun, still in his right hand, across his body, twisting his torso around toward the left, instantly pointing the gun at Green. (*Id.* ¶ 33.) At this point Foster was between the east side of the abandoned building and the passenger side of Green's car, with Foster positioned at a two o'clock angle, relative to Green. (*Id.* ¶¶ 31–2.) Fearing for his life, Green fired his gun, discharging it eight times, through his open passenger-side window, striking Foster. (*Id.* ¶ 34–6.) Mere seconds had passed between the time Green first pursued Foster and the shooting. (*Id.* ¶ 52.) As Foster began to buckle towards the ground, Green realized he had struck Foster, and stopped firing. (*Id.* ¶ 38.) Green also heard the sound of Foster's gun hit the concrete as it fell from his hand. (*Id.* ¶ 39.) Foster had not fired any shots. (*Id.* ¶ 37.) Although Green believed any imminent, lethal threat had been neutralized, he continued to keep his gun drawn and ordered Foster to drop his weapon, as he exited his car, cautiously positioning himself behind the engine area of his vehicle. (*Id.* ¶¶40–1.) Green then advised over the radio, "Shots fired. Subject down with a gun," and relayed his location. (*Id.* ¶ 42.) Later, of the eight bullet casings, six were collected from inside Green's car, one was collected from Green after he found it, wedged in his gun belt, and the other was collected from the ground, outside of Green's car, just to the west, near the front, passenger-side window of the squad car. (*Id.* ¶¶ 53–5; Pl.'s Stmt. ¶ 53.)

In the meantime, another Homestead police officer, Daryl Mays, also responded to the call. (Defs.' Stmt. ¶ 43.) Because of his location and the timing of his arrival, however, Mays did not witness Green's actually firing at Foster. (*Id.* ¶ 44)[5] However, Mays heard Green's call out of "shots fired" and so had his gun drawn as he proceeded, from the north face, around to the east face of the building, and onto the scene. (*Id.* ¶ 45.) As Mays rounded the corner, he saw Foster going to the ground. (*Id.* ¶ 46–7.) Mays also noticed the gun, lying next to Foster, and kicked it away, out of Foster's possible reach. (*Id.* ¶ 46–7.) Neither Green nor Mays touched the gun after this and it was later collected by investigating officers from the Miami-Dade Police Department. (*Id.*

---

[5] The exact timing of Mays's arrival on scene appears disputed but the parties do not disagree that Mays did not witness Green's shooting of Foster. (Pl.'s Stmt. ¶¶ 44–6.) Accordingly, even if the parties dispute exactly when Mays arrived, in relation to the shooting, the Court does not find the factual quarrel material.

¶¶ 50–1.) Mays handcuffed Foster, initially, but when it became apparent Foster was having trouble breathing, he removed the handcuffs and both Mays and Green began rendering aid. (*Id.* ¶¶ 48–9.)[6] There is no dispute that Green shot Foster eight times, in the back, in broad daylight. (Pl.'s Stmt. ¶ 73.) At least seven of those bullets hit Foster on the left half of his body. (*Id.* ¶ 74; Defs.' Stmt. ¶ 74.)

Aside from the factual disagreements highlighted above, Banuchi also frames disputes with the vast majority of the remainder of what is set forth above as well. Her disputes, however, are largely unsupported, as more fully explained below.

To start, Banuchi says she disputes Green's initial observations of Foster, but the support she points to is lacking. (Pl.'s Stmt. ¶ 11.) For example, she cites to the deposition of Julius Hall, a bystander seated in a car, three or so vehicles back from the intersection, heading eastbound on Lucy Street, waiting for the light to change, when he observed Green and Foster. (Hall Dep., ECF No. 63-29.) In the testimony Banuchi cites, Hall says he saw Foster crossing a street, and that he "was just walking normally, like I see a pedestrian walking." (*Id.* 15:23–24.) But Hall says he saw Foster before he saw Green arrive to the area and counsel made no effort to clarify whether Hall was able to opine on Foster's actual demeanor at the time Green would have first observed him. Further, Hall's description of Foster, from a distance, as "walking normally," does not controvert Green's perception of Foster as being nervous and agitated: one can walk normally while manifesting nervousness and agitation. Hall's testimony simply cannot support Banuchi's apparent contention that, at no point, as Green approached Foster, did Foster look suspicious or nervous. Further, Banuchi fails to provide any record support for her bald assertion that "Green did not see a heavy object holding down the left side of Foster's gym shorts." (Pl.'s Stmt. ¶ 11.) And, finally, Banuchi's reliance on record evidence from the medical examiner showing that "[n]othing heavy was ever recovered from Foster's pockets" is nonsensical: the "heavy object"—the gun—was recovered from the ground, at the scene of the shooting. (*Id.*) Further, whether or not something was "recovered from Foster's pockets" by the medical examiner, four hours after the shooting, has no bearing on whether Green perceived that Foster's shorts were being "partially pulled down, as if they were holding a heavy object" upon first encountering him.

---

[6] Banuchi disputes this, quibbling that Green didn't actually render any aid, only handing Mays supplies as Mays rendered aid. (Pl.'s Stmt. ¶ 49.) Such a nuance does not rise to the level of a genuine dispute of a material fact.

Similarly, Banuchi also maintains that Green's statement that, in his "experience, the appearance of [Foster's] gym shorts was consistent with an individual carrying a firearm in their shorts" is disputed. (Pl.'s Stmt. ¶ 12.) But nothing she presents actually has anything to do with Green's experience and how that experience shaped his conclusions about what Foster may have been carrying.

Banuchi also marks as disputed the Defendants' statement that Green decided to conduct an investigatory stop "based on the totality of the circumstances known to [him] at that time." (*Id.* ¶ 17.) In support, she cites to various excerpts of Green's deposition testimony. (Green Dep. at 149:17–151:23; 158:2–160:15; 168:1–21; 169:3–15.) Nothing from that testimony, however, contradicts the Defendants' statement that Green decided to conduct an investigatory stop "based on the totality of the circumstances known to [him] at that time." Instead, in the testimony Banuchi highlights, Green recounted the particulars of the dispatch call, acknowledged that the dispatcher did not identify any particular crime that had been committed, confirmed (repeatedly) that—upon initially encountering Foster—Green did not personally witness Foster committing a crime, and described his policing concerns about the report of a man at Blakey Park with a gun. (*Id.* at 149:17–151:23; 158:3; 168:1–21; 169:3–15.) None of this testimony, importantly, contradicts, or even calls into question, what Green says prompted him to conduct an investigatory stop of Foster.

Banuchi also says she disputes the Defendants' description of how Foster and Green's initial encounter unfolded, but the nature of her dispute is hazy as well as inconsistent. (Pl.'s Stmt. ¶¶ 18–20.) For example, she asserts that another officer and various bystanders' accounts contradict Green's statement that Foster initially ran towards the southeast. (*Id.* ¶ 18.) In support, however, Banuchi cites to testimony that, notably, doesn't have any bearing on what direction Foster may have been running when Green first saw him. (*E.g.* T. Barnes Dep., ECF No. 63-31, 13:9–16 (describing the direction a police car was traveling when the deponent neared the scene); D. Barnes Dep., ECF No. 63-32, 13:6 – 19 (same); Hall Dep., ECF No. 63-29, 26:9–20 (same); Mays Dep., ECF No. 63-6, 74:3–15 (describing the direction Foster was running when Mays initially observed him, before Mays had turned to head southbound onto Redland Road).) What's more, Banuchi previously *agreed* with the Defendants that, at least initially, Foster was traveling southeast, towards the vacant building. (Pl.'s Stmt. ¶ 9.)

Banuchi also maintains that whether Foster was startled by Green and whether or when the two made eye contact is disputed. (*Id.* ¶¶ 19–20.) She contradicts herself, later, though, in her statement of facts when she explicitly

concedes that, in fact, "Green's show of force startled Foster." (*Id.* ¶ 69.) Further, the bystander testimony she cites, in support of her position that Foster was not startled, fails to, in any event, legitimately bolster her contention. Instead, that bystander, Alexander Gutierrez, driving north on Redland Road at the time of the incident, merely outlines the dynamics of how he remembered Green's approaching Foster: notably, Gutierrez doesn't offer any insight as to whether Foster was startled or not. (Gutierrez Stmt., ECF No. 63-2, 1.) Similarly, although Gutierrez describes an instant when he perceived Green and Foster to have made eye contact, prior to Green's directly approaching Foster, that does not actually contravene Green's description of making eye contact with Foster upon approaching him. And, even if it could somehow be interpreted as conflicting with Green's version, any discrepancy is undercut by Gutierrez's admittedly conjectural recollections: much of his statement about the pair's initial contact is framed in speculation, with Gutierrez's frequently couching his narration of events with "I guess" or "probably." (*Id.*)

Unsurprisingly, Banuchi also takes issue with the way the Defendants describe the moments that directly preceded the shooting itself. (Pl.'s Stmt. ¶¶ 23–30, 44.) The problem with much of the evidence Banuchi relies on, however, is that she, again, attempts to equate a bystander's not happening to have witnessed or described an event to that event's never happening at all, outside of the bystander's perception or recollection. For example, Banuchi's reliance on bystanders Hall and Gutierrez's testimony about seeing Foster run from Green's car (*Id.* ¶¶ 23, 28), does not contradict Green's testimony that he drew his gun, pointed it through his windshield towards Foster, and then yelled, "Please let me see your hands! Put your hands up." Nor do Hall and Gutierrez's recollections refute Green's testimony that Foster then pointed his gun downward, towards the front bumper/grill area of Green's car as Green yelled at him to drop it. Further, Banuchi does not appear to refute Green's having shouted at Foster to show his hands but, rather, instead, says only that "[t]here is no evidence Foster heard Green." (Def.'s Stmt. ¶ 24.) The corollary to this, of course, is that there is also no evidence Foster did *not* hear Green. And, in any event, Banuchi provides no record support for her statement. Also of note is that many of the bystander witnesses were at appreciable distances from Green and Foster and in their cars, making it unsurprising that they did not hear Green's commands to Foster. Importantly, whether by design or inadvertence, Banuchi did not ask a single one of the witnesses whether they could say for certain, based on their respective locations in relation to the scene, whether or not Green ever shouted any commands to Foster. Without more, that these bystanders did not report hearing Green shout any commands

does not amount to evidence conflicting with Green's testimony that he did—no matter how favorably to Banuchi the Court views the record.

Similarly, the support Banuchi looks to in bolstering her insistence that Foster never had a gun, either in his shorts or in his hand, never pulled a gun out of his shorts, and never pointed his gun at Green is also unavailing. (*See, e.g.*, Pl.'s Stmt. ¶¶ 11–12, 25–28, 30, 33–35, 37, 39, 40–41, 50–51, 70, 72.) For example, Banuchi points to testimony from Tyquana Wright, who testified that she saw Foster, just prior to the shooting, at nearby apartments. In doing so, Banuchi highlights two lines from Wright's nine-page statement where she says she did not see the gun itself. Banuchi's presentation is remarkably deceptive, if not wholly disingenuous: despite not directly seeing the gun itself, Wright testified repeatedly that, when she observed Foster, whom she described as acting erratically, he indeed had a gun, though it was concealed by his clothing. (Wright Stmt. at 3:23; 4:2, 8–9; 5:8–10.) That is, what Banuchi fails to make clear is that, although Wright did not "see" the gun itself, she nonetheless perceived "[h]e was clutching a gun under his shirt." (Wright Stmt. at 3:23; *see also id.* 4:8–9; 5:8–10.) Additionally, the testimony Banuchi relies on from Gutierrez, Hall, Rogers, and Mays is not actually inconsistent with Green's testimony. First, none of those witnesses actually observed the entire encounter between Foster and Green, all of them losing sight of Foster at various points during the incident and the events leading up to it. Second, while a witness may not have necessarily seen or even perceived the gun, the Court cannot, from that, even reading the evidence in the light most favorable to Banuchi, make the inferential leap that Foster did not at any point have a gun—either in his shorts or in his hand. Again, no matter how generously the Court reads the testimony, a witness's inability to actually view the gun does not equate to the nonexistence of the gun. That is, a lack of visibility of the gun to some witnesses, without more, does not amount to genuine dispute of the Defendants' description of Foster's gun, his possession of that gun, or his handling of that gun.

In the same vein, Banuchi also disputes that Mays ever saw Foster's gun on the ground and kicked it away from him. (Pl.'s Stmt. ¶ 47.) But the witness testimony she relies on is wholly inadequate to introduce a genuine factual dispute. For example, Hall testified that, as he was driving by, on Lucy Street, headed eastbound, he did not "see anything around [Foster's] body." (Hall Dep. 66:25 – 67:6.) This is not the same as a witness testifying that he, for example, pointedly scanned the area around Foster's body and could conclusively opine that there was, in fact, no gun. Instead, Hall's testimony amounts to nothing more than a showing that he himself did not happen to see a gun near Foster as he was driving by the scene of the shooting, on the opposite side of the

street. Furthermore, the other witness Banuchi relies on never even expressed any ability to view the location of the actual shooting: based on his statement, his view of that location would have been either obscured by the abandoned building or behind him. (Gutierrez Stmt. at 1–3 (*e.g.* "I couldn't really actually see everything . . . .").)

Relatedly, Banuchi disputes that the Miami-Dade investigators collected the gun that Foster pointed at Green from the scene. (Pl.'s Stmt. at ¶¶ 50, 75.) In support, she maintains that "[n]o fingerprints or DNA evidence were found on the gun collected at the scene that would tie Foster to the gun." (*Id.* ¶¶ 50, 75) While the investigative reports indeed ultimately disclosed that "[n]o latent prints of value were developed" and that "no conclusions can be made regarding potential [DNA] contributors," those findings, without more, do not rule out Foster's handling of the gun nor do they rise to the level of introducing a genuine dispute of the Defendants' evidence as to Foster's possession of the gun or where the gun was located when Mays arrived on scene.

Banuchi's purported disputes as to the Defendants' description of the moment of the shooting and the events right afterwards are similarly flawed. (Pl.'s Stmt. ¶¶ 33, 35.) For example, Banuchi suggests that the Defendants' description of Foster's twisting his torso around to his left and pointing his gun at Green, just before Green fired, is contradicted by the medical examiner's report that she says shows "[t]he bullets . . . all entered Foster's body back to front, on the left side of his body." (*Id.* ¶ 33.) Banuchi's supposition is groundless. First, Banuchi's characterization of the report is inaccurate: one gunshot wound on Foster's right side was identified. (Med. Ex. Rep., ECF No. 63-26, 8.) But, more importantly, Banuchi fails to explain what is inconsistent about the two pieces evidence: without more, both can be true. Relatedly, Banuchi disputes that Green shot all eight rounds from inside his car because "[s]hell casings were found outside the vehicle." (Pl.'s Stmt. ¶ 35.) Again, that one casing was found just outside Green's open passenger window and one was found lodged in his gun belt does not create a genuine dispute as to the Defendants' cited testimony that Green shot all eight rounds from his car.

As an additional matter, the Court also finds Terrycal Rogers's cited testimony an unworthy source for Banuchi to rely on to refute Green's testimony that he fired all eight rounds from inside his car. (Pl.'s Stmt. ¶ 36 (citing Rogers Dep. at 18–23.) First, in referencing five pages of Rogers's deposition, the citation violates Local Rule 56.1(b)(1)(B)'s requirement that each fact must be "supported by specific, pinpoint references to particular parts of record material" and that "pinpoint references shall reference pages []and line numbers, if appropriate." For that reason alone the Court can strike this part of Banuchi's statement and thus deem the Defendants' well supported fact

admitted. L.R. 56.1(c)–(d). More importantly, however, the testimony Banuchi cites is blatantly contradicted not only by other, incontrovertible record evidence, but by Banuchi's own version of the facts. To illustrate, Rogers's testimony was that she saw two officers, standing in a "V formation," yelling at Foster to get down, just before both simultaneously began shooting at him. She also testified that there were two rounds of shots—one while she was inside her office, across Lucy Street; and then a second, when she says she came outside and witnessed the two officers' shooting at Foster. This testimony, though, is wholly at odds with every single other witness's description of the shooting: that there was only one round of shots and that only one officer—Green—actually fired his gun. Rogers's testimony also directly conflicts with the physical evidence: again, six casings were found inside Green's vehicle; one on the ground, just outside Green's passenger-side window; and one in his belt. For the Court to credit Rogers's testimony—that two officers had been shooting, at a distance from each other, towards Foster—it would have to either disregard the physical-casings evidence (which neither party disputes) (*see, e.g.*, Bello Firearm Rep., ECF No. 63-33, 2 (noting that the eight casings were fired from Green's gun)); or make all kinds of unreasonable inferences and leaps of logic about how the casings—supposedly shot by two different officers, standing apart from one another—could have possibly all ended up where they did. Further, Rogers's testimony is also incompatible with Banuchi's own version of the facts: Banuchi herself asserts that "Officer Mays was not even out of his vehicle when shots were fired. Mays was not near the scene when shots were fired" (Pl.'s Stmt. ¶ 44) and "Foster was already down when Mays arrived" (*id.* ¶¶ 45–6). Lastly, the testimony Banuchi cites from Rogers describes a fairly protracted exchange between the officers and Foster, where the officers are both telling Foster to get down, with Foster's replying, "I ain't got shit," before Foster is shot. (Rogers Dep. 19:17–24.)[7] In contrast, Banuchi herself does not note any dialog right before the shooting and instead says that, as Foster ran, Green simply "pursued [him] behind an abandoned building . . . and shot [him] eight times in the back." (Pl.'s Stmt. ¶¶ 72–3.) Accordingly, then, despite Rogers's testimony, the Court finds the Defendants' statement, that Green fired all eight shots from inside his car, undisputed. *See Hunter v. Leeds, City of*, 941 F.3d 1265, 1281 (11th Cir. 2019) ("When one

---

[7] Elsewhere in her deposition, Rogers also describes the exchange between the officers and Foster as "going back and forth" and that Foster repeatedly told the officers, "I don't have anything" and "I don't have nothing." (Rogers Dep. 10:21–11:4.) Rogers even testified, later in her deposition, that she herself interacted with Foster at one point, just before the shooting. (*Id.* 41:10–18; 51:6–9, 24–5.) None of this testimony is reconcilable with the rest of the record, including Banuchi's own version of events.

party's version of events is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") (cleaned up).

### 2. Legal Standard

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *See Alabama v. N. Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmovant, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970), and it may not weigh conflicting evidence to resolve disputed factual issues, *see Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007). Yet, the existence of some factual disputes between litigants will not defeat an otherwise properly grounded summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the record as a whole could not lead a rational trier of fact to find in the nonmovant's favor, there is no genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[O]nce the moving party has met its burden of showing a basis for the motion, the nonmoving party is required to 'go beyond the pleadings' and present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00*, 391 F. App'x 791, 794 (11th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but [instead] must set forth specific facts showing that there is a genuine issue for trial." *See Anderson*, 477 U.S. at 248 (citation omitted). "Likewise, a [nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." *Maddox-Jones v. Bd. of Regents of Univ. of Ga.*, 2011 WL 5903518, at *2 (11th Cir. Nov. 22, 2011). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita*, 475 U.S. at 586.

### 3. Analysis

#### A. Officer Green is entitled to qualified immunity as to Banuchi's excessive-force claim under the Fourth Amendment.

"Qualified immunity offers a complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006) (cleaned up). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

"[T]o receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* The parties do not dispute that, here, Green was acting within the scope of his discretionary authority. Accordingly, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* In determining whether qualified immunity is appropriate, courts apply a two-part test: (1) whether, "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right"; and, if so (2) "whether the right was clearly established" at the time of the violation. *Scott v. Harris*, 550 U.S. 372, 377 (2007) (cleaned up). Here, the Court doesn't reach part two because, in answering part one, the Court finds no violation of a constitutional right.

Even Banuchi does not argue, based on the undisputed facts as they are presented above, and read in the light most favorable to her, that Green's resort to deadly force was unreasonable. Indeed, she cannot—from the United States Supreme Court, to the Eleventh Circuit, to district courts in the Southern District, the caselaw is unwavering: "It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself." *Hunter*, 941 F.3d at 1279; *see also Brosseau v. Haugen*, 543 U.S. 194, 197–98 (2004) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.") (cleaned up); *EH ex rel. Moore v. City of Miramar*, 111 F. Supp. 3d 1307, 1326 (S.D. Fla. 2015) (Zloch, J.) ("Because the Constitution permits the use of deadly force to prevent a violent suspect from escaping, the Constitution must also permit the use of deadly force against a suspect who poses not merely an escape risk (because he is not yet in police control), but also an imminent threat of danger to a police officer or others.") (cleaned up).

Nor does Banuchi argue, based on the undisputed facts as they are presented above, and read in the light most favorable to her, that Green's initial investigatory stop of Foster was unreasonable. Again, this is because she cannot: "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123

(2000); *see also Clark v. City of Atlanta, Ga.*, 544 F. App'x 848, 854 (11th Cir. 2013) (affirming the reasonableness of an investigatory stop, coupled with a use of lethal force, where officers observed three people, one of whom had his hands in his pockets, standing in the yard of a vacant home, in a residential area that had been targeted for burglaries).

Based on Foster's proximity to Blakey Park—an area known for fights and shootings—and the direction of Foster's travel, at the time Green first observed him, combined with Foster's appearance matching the reported description, Green had reason to approach him. As their paths neared, and Green noticed Foster's nervous and agitated demeanor and, at the same time, observed something heavy, partially pulling down his shorts, Green reasonably perceived that Foster was likely armed and therefore justifiably approached him with his own gun drawn, commanding Foster to show his hands. *See United States v. Aldridge*, 719 F.2d 368, 371 (11th Cir. 1983) ("The use of a gun in connection with a stop is permissible when the officer reasonably believes it is necessary for his protection."); *see also Clark*, 544 F. App'x at 854 (noting that "it was reasonable for the officers to believe" that a subject "standing with his hands in his pockets," "might have been carrying a weapon," and that, therefore, they "were justified in exiting their car with their weapons drawn"). Thereafter, as Green pursued Foster around to the east side of the abandoned building, with Foster refusing to heed any of Green's commands and, ultimately, aiming his gun at Green, Green was justified in shooting Foster eight times: Green "was not required to wait and hope for the best." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (cleaned up); *see also Garczynski v. Bradshaw*, 573 F.3d 1158, 1169 (11th Cir. 2009) ("[W]here orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force.") ("[T]he officer was justified in shooting the fleeing suspect because the officer could reasonably believe that the man posed a risk of serious physical injury to the officer and others."); *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) ("[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.") (recognizing that "officers are taught to keep shooting until the threat is over").

To the extent Banuchi's opposition to the Defendants' motion relies on her insistence that Foster was unarmed and never pointed a gun at Green, it falls flat, for the reasons set forth above. Additionally, her other arguments are unavailing as well. In particular, one of Banuchi's contentions is that Green's stop of Foster was not justified because Green did not suspect Foster of having committed a crime and "carrying a concealed firearm is not sufficient, without

more, to justify a *Terry* stop." (Pl.'s Resp. at 11.) But, here, there was more: there was a dispatch that Green reasonably perceived as describing a subject who was displaying a gun at a park in a way that warranted police contact (Green Dep. at 150:25–151:3); the park and nearby area "has had its share of altercations and shootings" (*id.* at 150:7–9); when Green initially observed Foster, who matched the description, he was nervous and agitated, furtively looking back, over his shoulder (*id.* at 156:11–12; 175:15–17); and Foster was startled when he first made eye contact with Green (*id.* at 174:1–6). Considering the totality of the circumstances, Green had a well-founded suspicion of criminal activity. *See Burnett*, 246 So. 3d at 520 (recognizing that "furtive behavior" combined with carrying a gun could support an investigative stop); *see also Baptiste v. State*, 995 So. 2d 285, 301 (Fla. 2008) (recognizing that corroborating evidence that goes beyond mere "innocent details," including nervousness and indications that a subject possesses a gun, can support an investigatory stop).

Banuchi also argues that summary judgment is not warranted because "a jury may reasonably reject Green's self-defense claim in light of his prior shootings." (Pl.'s Resp. at 16.) As Banuchi points out, Green's shooting of Foster is his sixth shooting, three of which were fatal, in ten years, making him responsible for 36% of the entire City's police department's uses of deadly force. (*Id.*) Green claimed self-defense in each case. Accordingly, says Banuchi, based on the "doctrine of chances," "the court may reasonably begin to question whether Green actually acted in self-defense and whether his use of force was justified." (*Id.* (cleaned up) (quoting *United States v. Henthorn*, 864 F.3d 1241, 1253–54 (10th Cir. 2017)).) Although the Court certainly finds the recited statistics, without more, disturbing, Banuchi's proposition, nonetheless, falls flat. First, in each case Banuchi highlights, including this one, the Miami-Dade State Attorney's Office found Green's use of force justified. (Defs.' Reply at 2.) Further, the Court does not find the doctrine of chances applicable here. The doctrine in an evidentiary standard that may apply to admit other-act evidence where there is "a string of improbable incidents" that are "unlikely to be the result of chance." *Henthorn*, 864 F.3d at 1252 n.8. But Banuchi provides no support for her contention that these shootings are so improbable that the doctrine should apply. Indeed, there is no dispute that all six shootings occurred while Green was on duty, as a law enforcement officer, carrying a firearm as part of his duties in policing crime in dangerous settings. It is not by mere chance that a police officer would be faced with multiple scenarios in which he encounters situations where the need to use lethal force for the defense of himself or others would arise. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989) ("The calculus of reasonableness must

embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

In sum, after viewing the evidence in the light most favorable to Banuchi, the Defendants have established that Green is entitled to summary judgment as to Banuchi's § 1983 excessive force claim.

### B. The Defendants are entitled to summary judgment on Banuchi's state-law wrongful-death claims.

Banuchi premises her claims under Florida's Wrongful Death Act against Green and the City on a theory of battery. Accordingly, the municipal liability provisions of Florida Statutes section 768.28 apply. Under section 768.28(9)(a), Green may be held personally liable only if he "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). If he did not act in any of these ways, however, "the plaintiff's exclusive recourse is to seek damages from the governmental entity"—here, the City. *Keck v. Eminisor*, 104 So. 3d 359, 366 (Fla. 2012). As the Defendants point out, there is no record evidence showing that Green acted "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." (Defs.' Mot. at 15.) In response, Banuchi does not identify any facts in the record that Green acted in any of these ways. Instead, she argues that (1) Green lacked reasonable suspicion to stop Foster; (2) Green did not first talk to Foster; (3) Foster rightly fled, attempting to escape Green's threats; (4) Green improperly pursued Foster; and (5) rather than just running Foster over with his car, Green instead chose to shoot him in the back. (Pl.'s Resp. at 19.) First, Banuchi's version of events is not supported by the record. And, second, once Foster gave flight, refusing to comply with Green's commands, and then pointed his gun at Green, Green was justified in chasing and then shooting him, even if, in hindsight, less-than-lethal options might have existed. *See Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) (concluding the use of deadly force was reasonable, even though other, potentially non-lethal means of preventing a suspect's escape may have existed). Ultimately, Banuchi does not identify any action taken by Green that would amount to bad faith, malice, or wanton and willful disregard of human rights, safety, or property. Accordingly, Green is immune from suit under Florida Statutes section 768.28(9)(a).

For similar reasons Banuchi's remaining claim, against the City for vicarious liability, also based on a theory of battery, is barred by Florida Statutes section 776.05. Under Florida law, a "battery claim for excessive force

is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). Importantly, "a presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is clearly excessive." *Id.* And an officer who "reasonably believes" his use of force is "necessary to defend himself or herself or another from bodily harm while making [an] arrest" is afforded a complete defense to an excessive use of force claim. Fla. Stat. § 776.05(1). Since Green would be entitled to a complete defense under section 776.05, the City is, as well. Banuchi has not come forward with any evidence to rebut the Defendants' showing that Green was justified in the use of force against Foster when Foster's actions resulted in Green's reasonable and imminent fear of death or great bodily injury. Again, Foster gave flight, refused to comply with Green's commands, and then pointed his gun at Green. As a result, the City is also entitled to summary judgment in its favor on Banuchi's state-law battery claim.

### 4. Conclusion

The Court recognizes that a "case involving a police officer's use of deadly force may present a special concern on summary judgment." *Williams v. Deal*, 659 F. App'x 580, 583 (11th Cir. 2016). And it is certainly disturbing when "the witness most likely to contradict the police officer's story—the person shot dead—is unable to testify." *Id.* But, where the other record evidence simply "doesn't contradict a police officer's direct testimony, conjecture cannot create a genuine issue of material fact." *Id.* And, to be sure, here, in order for Banuchi's version of the facts to carry the day, even more than conjecture would be required. Ultimately, the Court is left with the record before it. And based on that record, the Court is unable to discern how a rational trier of fact could find in Banuchi's favor.

Consequently, for the reasons set forth above, the Court **grants** the Defendants' motion (**ECF No. 60**), granting summary judgment in their favor on the remaining counts in this case. The Clerk is, thus, directed to **close** this case. Any other pending motions are **denied as moot**. The calendar call set for **June 28, 2022**, and trial set for the trial period beginning **July 5, 2022**, are hereby **canceled**.

**Done and ordered**, in Miami, Florida, on June 17, 2022.

Robert N. Scola, Jr.
United States District Judge